THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN J. TROLIA, Defendant-Appellant.

First District (5th Division)    No. 77-374

Opinion filed February 23, 1979.

James J. Doherty, Public Defender, of Chicago (Matthew J. Beemsterboer and Sheila M. Murphy, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Michael E. Shabat, and Francis X. Speh, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) and sentenced to 25 to 75 years in the Illinois Department of Corrections. On appeal he contends that he was deprived of a fair trial by the State's failure to disclose a witness' statement which was in police possession during the trial. He also contends that he was not proven guilty beyond a reasonable doubt, and that the trial court erred when it: (1) allowed the introduction of irrelevant scientific evidence; (2) allowed a rebuttal witness to contradict him on a collateral matter; (3) prevented him from adequately cross-examining two of the State's witnesses: and (4) prohibited defense counsel from personally conducting his own voir dire examination of prospective jurors.

The following pertinent evidence was adduced at trial.

*For the State*

*Richard "Animal" Maskas*

On August 30, 1974, at approximately 5 p.m. he saw defendant John Trolia in the On the Rocks Lounge at 63rd and Narragansett. He had known him for six to seven months, and also knew him as "Wolfman

Jack." Trolia said that some people were looking for him and asked if he "had something he could use." He gave Trolia a small loaded four-shot derringer which he said he wanted back. Trolia gave the empty gun back to him a couple of days later and told him that he blew the shells off in the parking lot and that the gun could be hot. Several nights later, Trolia approached him in the On the Rocks Lounge and told him that he had used the gun to shoot a girl and a guy. When Maskas was arrested on September 8, 1974, in Chicago on a battery charge, he threw the gun out the window so he "wouldn't get busted with it." On September 19, 1974, he went to the Homewood Police Station with Investigator Leubscher and signed a written statement.

On cross-examination he admitted that he carried the loaded weapon he gave to Trolia concealed in his shirt pocket and that he knew that this was illegal in the City of Chicago. He acknowledged that he has been convicted of the possession of marijuana and currently has pending against him charges of theft and possession of drugs and mace. He acknowledged that after the police told him that they thought the gun was used in the killing of Paula Popik, he decided to tell them about Trolia because he "wasn't going to take the beef for someone else." He denied being under arrest for the murder of Paula Popik.

*Richard Mariscal—an employee of the Godfather Lounge*

On the evening of August 31, 1974, he saw Paula Popik working as a bartender at the lounge. She was wearing a dark halter top and dark "hot pants." At approximately 10:30 or later that evening he served her a hot dog on a sesame seed bun. He last saw her there at approximately 3:30 a.m.

On cross-examination, he testified that he did not notice a butterfly decal on Popik's stomach, that he did not see her dancing with anyone and that he did not see Mike McNichols or John Trolia in the lounge that night.

*Maria Sizemore—a part-time bartender at the Godfather Lounge*

She arrived at the lounge on August 31, 1974, at about 8:30 p.m. She and Paula Popik worked the same bar that night. She corroborated Mariscal's testimony concerning Popik's clothing and eating of a hot dog between 9:30 and 10. She noticed that during the course of the evening Popik spoke to a man named Mike, and danced with him while on break. Popik was standing at the door talking to Mike when she left at approximately 3:30 a.m.

*Michael Herman McNichols*

On August 31, 1974, he arrived at the Godfather Lounge between 11:30 and 12. While there he talked and danced with Paula Popik, who wore black "hot pants," a halter top, lacy sleeves, black high-heeled shoes, a small black purse and a butterfly decal on her waistline. He later saw her

receive her wages in cash. Between 3:45 and 4 a.m. he escorted her to her car, a late model Chevrolet Nova which was parked in front of the lounge. She entered the car and drove down 111th Street until Harlem Avenue, where she turned right, going north.

On cross-examination he acknowledged that he had been drinking beer that evening, but did not know if Popik had been drinking and stated that she appeared to be sober.

*Robert Sizemore, Maria Sizemore's husband*

Between 4:30 and 5 a.m. on September 1, 1974, he saw Paula Popik sitting with another girl and two or three men at a club on 63rd Street called On the Rocks. The men were Caucasian with medium build and hair length, and one of them may have had a mustache.

On cross-examination he admitted that he did not see Popik sitting at the bar with one man, nor did he see her leave the premises.

*Robert Shanklin—a doorman at the On the Rocks Lounge*

At close to 5 a.m. on September 1, 1974, he saw defendant John Trolia at the lounge with a girl he had never seen before. The girl was a brunette, a little taller than Trolia, wore dark clothes and "had nice legs." As she left, he said to Trolia "John, it looks like you have a live one." Trolia did not answer him. He did not see Richard Maskas in the lounge that evening.

*Linda Szilagyi—waitress at the On the Rocks Lounge*

She is a divorcee and she and her three children have been living with Thomas O'Neill for four years. At approximately 5 a.m. on September 1 while working at the lounge, she saw John Trolia with Paula Popik. At about 5:30 a.m. Szilagyi returned home and went to sleep. About an hour later, Trolia knocked on her door. He seemed nervous and upset, and asked if he could come in. She let him in and went back to sleep. When she awoke at 9 a.m. O'Neill, Maskas, Trolia and her children were all there. They all had breakfast and then drove to the north side. John Trolia was her friend and often baby sat for her children. When the police asked her on December 10th whether she saw Trolia with the murder victim, she lied and said that she couldn't remember him being with any girl in particular, because she "didn't want to get Johnnie in trouble." She first told someone in authority that she had seen Trolia with Popik on February 13, 1975, when she talked to Assistant State's Attorney Michael Ficaro.

On cross-examination she denied being afraid of "Animal" Maskas and denied that he had pointed a gun at her children. She admitted that O'Neill and Maskas wanted to go to the north side on September 1 to get a drug called "T.H.C." which made Maskas "kind of rowdy."

*Daniel Steimach*

He lives in Summit at 5511 South 73rd Avenue approximately 25 feet

northeast of the Fleetwood Roller Rink. At approximately 6:30 a.m. on September 1, 1974, he saw a small tan Chevrolet burning directly behind the roller rink and called the fire department. The firemen arrived within ten minutes.

On cross-examination he acknowledged that he did not see John Trolia anywhere in the vicinity of the burning car.

*Michael B. Stoncato—a patrolman for the Village of Summit*

On September 1, 1974, pursuant to a radio communication, he went to the Fleetwood Roller Rink and examined a burned-out brown Chevrolet Nova. He traced the car's license plates as being registered to a "James L. Ponik [*sic*]."

*Phillip Lucas*

At approximately 4 p.m. on September 6, 1974, he was in the vicinity of Route 171 and 55th Street, which is also known as Archer Avenue. As he walked over the bridge on First Avenue, he looked over the guard rail and observed what appeared to be a female body with a black rope around its neck and shoulders floating in the river. After watching the body for approximately one hour, he walked over to Archer Avenue, hailed a passing squad car, and directed the police officer to the body. He remained at the scene for a period of time and saw the body removed from the water.

On cross-examination he testified that the day in question was partly sunny with a temperature of 75 to 80 degrees. He acknowledged that the body he observed appeared to be stationary and stuck in the mud.

It was stipulated by both parties that Paula Popik's body was removed from the Des Plaines River on September 6, 1974, that it was taken to MacNeal Memorial Hospital, that she was pronounced dead at 7 p.m. by a Dr. Jethani, and that on the following day, September 7, a post-mortem examination and autopsy were performed on the body by a Dr. Claparols of the Cook County Morgue.

*James Popik—Paula Popik's brother*

He last saw his sister alive and in good health on August 30, 1974. On September 2, 1974, he went to the Chicago Ridge Police Department to report a lost license plate. In response to a police officer's inquiry, he acknowledged that he owned a 1972 Nova. The officer told him that the car had been found burned in Summit the day before. After he contacted his father and his other sister, Karen Muller, they went to 63rd and Lawndale and made a missing persons report. On September 6, 1974, he accompanied two Sheriff's Police Investigators to the Cook County Morgue where he identified a body they brought him as being his sister Paula.

*Joseph Claparols—a Coroner's Office Pathologist*

He has performed approximately 800 post-mortem examinations. On

September 7, 1974, he performed an internal and external examination on the body of Paula Popik. He observed skin slippage, swelling and reddening of the skin, and a high visibility of certain superficial veins caused by the putrefaction of the body that occurs several days after death. He observed lacerations around the face and neck, chief of which was a wound caused by a bullet located on the right temporal region of the head in front of the ear. He also found that there was a reddening of the left side of the external genitalia, and that a mud-like substance covered the body. In the stomach he found a moderate amount of partially digested food, including some seed-like particles. Food normally leaves the stomach within six hours, although that time may be lengthened by the person's feelings of anxiety. The putrefaction he referred to produces gas inside the body, and will normally cause a body to float sometime between five and eight days. Reddening and swelling of the skin will also normally occur after five to eight days, although it would be affected by water temperature, and would be greatly accelerated by a water temperature between 70 and 100 degrees. A water temperature of 50 to 67 degrees would not be a greatly accelerating factor.

On cross-examination he stated that he could estimate post-mortem changes as an expert, but he recalled telling defense counsel that he was not an expert at judging post-mortem changes. He acknowledged that in the lower extremities of the body, he detected some rigidity. Under normal conditions rigidity leaves the body in a day and a half or, if the body is in water of normal temperature, in two to four days. He conceded that in water which had a warmer temperature than normal, rigidity would leave the body sooner and the body would float faster. He admitted that he did not know what a "normal temperature" for a body of water would be, and that he was not told the temperature of the river from which the body was taken. He could not recall what type of seeds were found in the victim's stomach.

It was stipulated by both parties that on August 5, 1974, and October 8, 1974, the Illinois Environmental Protection Agency took water samples from the Des Plaines River approximately one mile from where Paula Popik's body was found, and that the temperature of water on each aforementioned date was, respectively, 67 degrees and 54 degrees.

*Thomas E. O'Neill—common law husband of Linda Szilagyi*

On September 1, 1974, at 8:30 a.m. he was awakened when John Trolia came and asked to stay at his house. He went back to sleep and woke up again at 9 a.m. They all had something to eat. After breakfast, he, Trolia, and Linda and her children went up north in his car to Bob Holwell's house. As they sat around talking, Trolia told him that he needed an alibi for Saturday night and Sunday morning, and that he would talk about it more later. The following Tuesday or Wednesday, he

and Bob Holwell talked to Trolia at the On the Rocks Lounge. Trolia said that he left the On the Rocks Lounge with his girl and as he was getting into the car a "Mexican popped up and [he] shot him in the head." Trolia further said that he shot the girl because she knew too much, threw her in the river, and got rid of the car. Bob asked Trolia where he got the gun. Trolia answered that he got it from Rich. O'Neill told Trolia that he would be his alibi, but later, after talking to Holwell, told Trolia that he couldn't be the alibi and didn't want to get involved. Trolia then told him that there was no Mexican involved, just the girl. On September 19, 1974, as Trolia and Holwell left the On the Rocks Lounge, the sheriff's police arrested them for murder. He went to the police station and spoke to an Officer Leubscher, but he didn't tell Leubscher what Trolia had said because he "didn't want to trick on him." A couple of days later, Linda showed him a newspaper article which contained photographs of Trolia and the girl who was murdered. He met with Leubscher again and denied any knowledge of the murder, but admitted that Linda had seen Trolia with "the girl" at the On the Rocks Lounge. He testified that he was called to the State's Attorney's Office on September 10, 1974. He admitted that he lied to Assistant State's Attorney Dan Pierce and Officer Leubscher when he said that he asked Trolia about the murder and Trolia told him to mind his own business. On February 13, 1975, he again went to the State's Attorney's Office and talked to Michael Ficaro because he "had to get it off my conscience." Ficaro told him that Bob Holwell had already told him everything.

On cross-examination, he denied that, on September 1, 1974, he had an argument with "Animal" Maskas or that Maskas punched and kicked things in his home. He admitted smoking marijuana on that day, and further admitted that at that time he normally drank more than 12 drinks a day. After being questioned by Officers Holt and Leubscher he signed a statement which stated that John Trolia did not tell him about the circumstances of Paula Popik's death, that he did not know of those circumstances, and that John Trolia never approached him regarding an alibi for September 1, 1974. He admitted that after signing that statement, Officer Leubscher talked to him a number of times and indicated that he could be charged with conspiracy to commit murder or some other type of crime.

*David Brundage—firearms examiner for the Bureau of Identification, Department of Law Enforcement, State of Illinois*

On September 11, 1974, he examined a .22-caliber projectile and a four-barrel derringer and concluded that the projectile could have come from the derringer.

On cross-examination he conceded that the projectile had insufficient

characteristics for a full comparison, and that he did not know whether the derringer was the gun that killed Paula Popik.

*Robert Holwell*

On September 1, 1974, John Trolia and Thomas O'Neill were at his house. Trolia told him that he had gotten into trouble the night before and needed an alibi. He and O'Neill saw Trolia again at the On the Rocks Lounge on September 3. Trolia said that on Saturday night he and a girl had left the lounge and went to her car, that a big Mexican had jumped him, that he shot the Mexican and the girl, threw their bodies in the river, burned the girl's car, and later returned the gun he used to "Animal" Maskas. Trolia later admitted to him that there was no guy involved, only a girl. Holwell subsequently told his brother, Sergeant Joseph Holwell of the Bridgeview Police Department, that he did not know anything about the murder of a girl whose body was pulled out of the river. On September 18, he told his brother that he heard that "Animal" Maskas had been picked up on a gun charge in Chicago, that this might be the gun that was used in the murder, and that Maskas had lent it out. He testified that when he was first asked questions before the grand jury he did not answer all questions truthfully. However, he later called his brother, who convinced him to tell the truth and not to try to protect Trolia. Afterwards, he went back and told the truth to the grand jury.

On cross-examination he denied that his testimony was given in exchange for the State's promise not to bring charges against him for perjury. He admitted that he was arrested for Popik's murder himself, and that the police at that time found some marijuana he had in the vehicle that he was driving. To his knowledge he was not charged with the possession of marijuana. He conceded that because Officer Leubscher questioned him frequently he thought he was hassling him, but he denied being threatened by Leubscher.

*George R. Leubscher, Investigator for the Cook County Sheriff's Police*

In September 1974, he was assigned to investigate the murder of Paula Popik. After two conversations with Sergeant Joseph Holwell of the Bridgview Police he went to the Chicago Crime Lab and found a .22-caliber derringer which was turned in pursuant to the arrest of Richard Maskas. He picked up Maskas, took him to the police station in Homewood, and told him that they knew that he owned the above mentioned gun, and that it had been used in a homicide. Maskas said that he was not going to take the heat for anyone, and that he had lent the gun to John or "Wolfman" Jack Trolia. After Maskas signed a written statement, he was released. He arrested Trolia that afternoon. He also took statements from Robert Holwell and Thomas O'Neill. He gave

Trolia permission after his arrest to make a phone call to his girl friend. Trolia dialed a number and said, "They have me in jail for murder" and "They said I shot a girl in the head." Prior to that time neither he nor anyone in his presence had told Trolia that Paula Popik had been shot in the head.

On cross-examination, he acknowledged that Popik's cigarettes and lighter were found on her boyfriend's steps. He acknowledged that Trolia offered no resistance when he was arrested. He admitted that Maskas was taken into custody for questioning, but denied that he was ever charged with murder.

*Daniel J. Pierce—an Assistant State's Attorney*

He worked on the prosecution for the murder of Paula Popik. In February 1975, he had a conversation with Bob Holwell in his office. During the conversation, Holwell made a phone call. Neither he nor anyone in his presence promised Holwell anything or told him that if he did not say what they wanted to hear, he would be charged with perjury.

On cross-examination, he stated that to his knowledge, Holwell was never charged with perjury for his testimony before the grand jury.

*For the Defense*

*Ronald Holt—an Investigator for the Cook County Sheriff's Police*

He worked on the homicide case of Paula Popik. On September 17, 1974, he talked to Robert Sizemore who told him that on September 1, 1974, between 4:30 and 5 a.m., Popik had been at the On the Rocks Lounge with four or five people, including two or three males. Sizemore further told him that he did not know if Popik left with the group or with one individual, but that the entire group left at approximately 5 a.m.

*Defendant John Trolia on his own behalf*

On August 31, 1974, he went to the wrestling match at White Sox Park and then to the On the Rocks Lounge with Bob Holwell, Micky Thomaso and Carl Calvina. At approximately 1 a.m. Thomaso and Calvina left the lounge. He asked Holwell for a ride home, but Holwell said he was too drunk. Holwell went outside to sleep in the car. Trolia fell asleep inside the lounge. When he woke up at approximately 2:30 a.m. he saw and talked to Linda Szilagyi and Richard Maskas. At 4:30 a.m. a man at the bar gave him a ride to Tommy O'Neill's house. Tommy let him in and asked where Linda was, and whether she was with "Animal" Maskas. He said he didn't know and didn't want to get involved. He fell asleep on the couch, and woke up around 8. He looked out the window and saw Richard Maskas, Linda Szilagyi and John Boyle. When Linda and O'Neill started arguing, he, Maskas and Boyle left. They went to the "Dunkin' Donuts" on Archer Avenue, and he noticed that Maskas had over a hundred dollars. Maskas said he had "ripped off a drug dealer." Later, he,

Maskas, O'Neill, Linda and her three children drove to the north side. They stopped on the way to get some wine and beer. They subsequently arrived at Bob Holwell's house in Hickory Hills. As they were driving back to O'Neill's house Maskas, who was "acting kind of crazy" because of "the dope that he had took," pulled out his derringer and pointed it at Linda's children. He had seen Maskas with that gun on numerous occasions, but denied that he ever asked to borrow it from him or that he ever had it in his possession. He baby-sat many times for Szilagyi and O'Neill from October until February, when he was arrested. He did not know Paula Popik, he did not see her in the On the Rocks Lounge on September 1, and he did not kill her. He never borrowed the derringer from Richard Maskas, or told Holwell or O'Neill that he needed an alibi for September 1, or told them that he murdered Paula Popik. In 1972 he was convicted of conspiracy to solicit to commit an armed robbery.

On cross-examination, he stated that Mr. "Shankland [*sic*]" was lying when he said that he saw him leave the lounge with Popik and when he claimed to have said, "John you've got a live one tonight."

*For the State in rebuttal*
  *Les Breen—Treasurer of the Chicago White Sox*
  There was no wrestling match held at the park that evening. The event held at White Sox Park on the evening of August 31, 1974, was a baseball game between the Chicago White Sox and New York Yankees.

On cross-examination, he admitted that a wrestling match was held at White Sox Park on the evening of September 7, 1974.

*For the Defense in surrebuttal*
  *Defendant John Trolia*
  The wrestling match he attended at White Sox Park could have been held on September 7, 1974. He remembered that in the late evening and early morning hours of August 31 and September 1 he was in the On the Rocks Lounge.

Opinion
  Defendant first contends that he was deprived of a fair trial by the State's failure to disclose before trial the existence of a witness and her exculpatory statement. This statement was recovered by defense counsel through a post-trial subpoena for all police reports concerning the murder of Paula Popik. Recovered from the police chief of the Village of Summit was a statement taken from Rebecca Lavin at 9 p.m. on September 6, 1974, by Investigators James Houlihan and J. Vanerio of the Cook County sheriff's police. Lavin stated to them that she had known Paula Popik for six or seven months and last saw Popik on September 3, after 10 p.m. in

the Godfather's Lounge in Chicago Ridge. Defendant correctly points out that prior to trial, in his motion for discovery under Supreme Court Rule 412 (Ill. Rev. Stat. 1977, ch. 110A, par. 412), he specifically requested:

> "That the prosecution disclose to the defense the names and addresses of any witness or witnesses that may be or would be favorable to the defense. These witnesses to be clearly and separately identified on the List of Witnesses. The same disclosure is requested of any physical evidence or scientific evidence that might be or would be favorable to the defense."

Defendant argues that in light of this request, the State's failure to disclose the existence of Rebecca Lavin or her statement deprived him of a fair trial, and his motion for a new trial should therefore have been granted.

In responding to this argument, the State cites and relies upon *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392. However, we find that the State's reliance on that case is misplaced. In *Agurs*, no pretrial request for evidence was made by defendant. The United States Supreme Court held that in such cases, or in cases where only a general request for all exculpatory matter is made, the prosecutor's constitutional duty of disclosure is violated only when any undisclosed evidence creates a reasonable doubt of guilt which did not otherwise exist. More relevant to the case at bar is *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, where, as here, a specific pretrial request was made. The Supreme Court held that in such cases, due process requires that the prosecution disclose to the accused all favorable evidence which is material to either guilt or punishment. This rule has been codified in Illinois by Supreme Court Rule 412(c) (Ill. Rev. Stat. 1977, ch. 110A, par. 412(c)), which requires that following written motion of defense counsel:

> "[T]he State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor."

Through this rule, our supreme court has required that an accused receive before trial the information to which he is entitled under *Brady. People v. Elston* (1977), 46 Ill. App. 3d 103, 360 N.E.2d 518; see also Committee Comments, Ill. Ann. Stat., ch. 110A, par. 412(c), at 681 (Smith-Hurd (1976).

There can be no doubt that the undisclosed evidence in this case is material and "tends to negate the guilt of the accused." The State in its indictment states and through its witnesses attempts to support the charge that defendant murdered Paula Popik in the early morning hours of September 1. Yet the undisclosed statement of Rebecca Lavin, who knew the victim, indicates that she saw her alive and well late in the evening of September 3, almost three days after the alleged time of the murder. Her

statement, therefore, clearly contradicts the State's case against defendant. The State concedes that the undisclosed statement was "favorable" to defendant and should have been heard by the jury. It points out, however, that the judge who presided over defendant's trial considered the undisclosed evidence at a hearing on his motion for a new trial, weighed the evidence, and concluded that it was not sufficient to warrant a new trial. The State argues that this examination of the evidence protected defendant from any prejudice its nondisclosure might have caused him, and that a new trial is therefore not warranted. We completely disagree with that argument. In *People v. Dixon* (1974), 19 Ill. App. 3d 683, 688, 312 N.E.2d 390, 394, in dealing with a similar situation, we stated that:

> "We do not agree that the hearing on the motion for a new trial was sufficient to render the non-production of the evidence prior to trial such that there was no violation of defendant's right of due process. The defense had a right, as noted above, to have this evidence made available to it at the time of the request. It is not this court's purpose to speculate as to what use the defense could or would have put the evidence in question, or what additional evidence it may or may not have led to, had it been turned over prior to trial. The fact remains that this evidence was not available, as it should have been, to defendant when his defense at trial was being planned and prepared. The belated turn-over of these reports after trial was sufficient to deprive defendant of their effective use and in no way cured the harm done by failing to turn them over to defendant initially."

Defendant herein was entitled upon request to have available to present to the jury all the pertinent exculpatory evidence which had been gathered. We conclude that the cure for the State's failure to comply with Supreme Court Rule 412(c) and disclose such evidence must be a new trial, rather than speculation by this or any other court as to what use or effect the evidence would have been to defendant had it been timely and properly disclosed.

In reaching the conclusion stated above, we reject the State's attempt to attach importance to the apparent fact that the Assistant State's Attorneys in this case were not aware that the undisclosed statement existed and was in police possession. We note that the goal of pretrial discovery is to promote the fact-finding process and thereby protect the defendant against surprise, unfairness, and inadequate preparation. (*People v. Rayford* (1976), 43 Ill. App. 3d 283, 356 N.E.2d 1274; see also *People v. Shegog* (1976), 37 Ill. App. 3d 615, 346 N.E.2d 208.) Supreme Court Rule 412(f) (Ill. Rev. Stat. 1977, ch. 110A, par. 412(f)) states that:

> "The State should ensure that a flow of information is maintained

between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged."

The failure to disclose which occurred below cannot be excused by the argument that the Assistant State's Attorneys were unaware of the statement's existence, since they and the police are required to cooperate and insure that all relevant information will be provided and that discovery will be accomplished. (*People v. Young* (1978), 59 Ill. App. 3d 254, 375 N.E.2d 442.) The required flow of information obviously broke down in this case and the goal of pre-trial discovery was not met. The proper remedy for that breakdown is a new trial. Because we reverse defendant's conviction and remand for a new trial, we do not comment on his remaining contentions.

Reversed and remanded.

MEJDA and WILSON, JJ., concur.