THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL GOLDSMITH, Defendant-Appellant.

First District (5th Division)   No. 1—93—0457

Opinion filed March 4, 1994.

Rita A. Fry, Public Defender, of Chicago (Richard E. Gade, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Veronica Calderon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

In August of 1991, defendant Michael Goldsmith was indicted for 12 counts of aggravated criminal sexual assault (720 ILCS 5/12—14 (West 1992)), three counts of criminal sexual assault (720 ILCS 5/12—13 (West 1992)), one count of home invasion (720 ILCS 5/12—11 (West 1992)), one count of armed robbery (720 ILCS 5/18—2 (West 1992)), one count of armed violence (720 ILCS 5/33A—2 (West 1992)), one count of residential burglary (720 ILCS 5/19—3 (West 1992)), and one count of aggravated unlawful restraint (720 ILCS 5/10—3.1 (West 1992)). After a bench trial on May 1, 1992, by the circuit court of Cook County, defendant was convicted of nine counts of aggravated criminal sexual assault, one count of home invasion, and one count of armed violence.

On December 21, 1992, defendant was sentenced to concurrent terms of 45 years' imprisonment for aggravated criminal sexual assault, 30 years for home invasion, 30 years for armed violence, and five years for aggravated unlawful restraint. Defendant filed a post-trial motion for a new trial. That motion was denied. Then defendant filed a motion for the court to reconsider its previous decision. In support of this motion, defense counsel submitted the affidavit of Dawn Larsen of De Kalb, Illinois. In her affidavit filed December 21, 1992, Ms. Larsen stated: "I remember Michael Goldsmith staying in

my apartment the evening of July 27, 1991. He stayed Saturday evening and left the next afternoon." Ms. Larsen also related that she was interviewed by two assistant State's Attorney's in January 1992, and that they took notes during the conversation. The motion to reconsider was also denied. A timely notice of appeal was filed.

Defendant requests that this court reverse his convictions and remand the cause for a new trial, or, in the alternative, that this cause be remanded for a hearing regarding the State's alleged nondisclosure of exculpatory testimony. Defendant makes two arguments: (1) he was denied his due process right to a fair trial where the State failed to disclose a witness; (2) he was denied his right to the effective assistance of counsel because if defense counsel had exercised reasonable diligence he could have located a witness whose testimony probably would have changed the outcome of the trial.

After the indictment was filed, the State filed a motion for pretrial discovery and an answer to discovery on October 17, 1991. The State declared that it would provide defendant with statements, reports, and other evidence as it became available. In its answer to discovery the State also stated that it was not aware "of any evidence or witnesses which may be favorable to the defense in this cause." On November 5, 1991, defendant filed an answer to the State's motion stating that it may rely on the defense of alibi. Defendant also provided the names and addresses of possible witnesses it may or may not call, including, but not limited to, James Mason, Thomas Frederickson, Jr., Thomas Frederickson, Sr., and Dave Jensen. Subsequently, on December 6, 1991, the State filed a supplemental response to defendant's answer stating that it may or may not call additional witnesses. On May 1, 1992, defendant filed a supplemental motion for discovery requesting "any and all materials within the State's possession or control which tends to negate the guilt of the accused," and "the names and addresses of any witnesses who may be or would be favorable to the defense."

The court held a hearing on defendant's motion to quash arrest and suppress evidence. The court denied defendant's motion to quash the arrest and suppress evidence, but it granted defendant's motion to suppress the in-person lineup identification for suggestive procedure. The court, however, reserved its decision on the question of the admissibility of an in-court identification by the victim to see if there was independent reliability for such an identification. On October 7, 1992, defendant requested a continuance of his case due to the unavailability of material witnesses. According to the State's brief, the court granted defendant's motion for a continuance.

The trial began on October 7, 1992. During the trial, the State presented testimony from the victim, T.H. T.H. testified that she lived in an apartment at 3221 West Armitage Avenue, Chicago, Illinois. The only door to the apartment was in the front. The lock on the door did not work all the time. T.H. could check to see if the lock was functioning properly by pulling on the door. T.H. lived in the apartment with her six-year-old son, Nicholas.

T.H. testified that on July 26, 1991, she spent the night at her boyfriend's house and went to work the next morning, Saturday, July 27, 1991. After work T.H. and her son visited T.H.'s friend, Julie, at her apartment. Julie lives about a block from T.H. When T.H. left Julie's apartment at 11 p.m. Saturday, July 27, 1991, Nicholas remained there. T.H. went to visit her boyfriend at a corner store before going home.

After she returned home, T.H. went to another store where she happened to see her friend, Marie. Marie invited T.H. over to Marie's house to watch movies. T.H. stayed at Marie's for about one hour and a half, until 1 or 1:30 a.m. While T.H. was at Marie's, Marie gave T.H. a beer to drink. T.H. drank about half of the beer and took the rest back to her apartment. T.H. returned to her apartment, having been "pretty certain that the door was locked" when she left. T.H. went to her son's bedroom to lie down and watch television. T.H. lay down, turned on the television, and fell asleep.

T.H. awoke the next morning with someone pulling her hair. T.H. testified that she was able to see the face of the person who was pulling her hair. She testified that his face was about a foot away from her own. Later, over defendant's objection, T.H. made an in-court identification of Mr. Goldsmith as the person who woke her. T.H. held defendant's wrists to try to stop him from pulling her hair. T.H. felt something "stuck to [her] throat." She later learned that the object was a knife. Defendant made T.H. lie on her stomach. Defendant blindfolded T.H. with her pantyhose that were hanging up to dry.

T.H. further testified that defendant tied her hands behind her back with another pair of pantyhose and told her that if she did what he said, he would not kill her. According to T.H.'s testimony defendant said that he wanted "a piece of [her] ass." Defendant said that he had just been released from jail and "that's the way he liked it." Defendant then removed T.H.'s clothing, and T.H. heard defendant unzip his pants. Defendant then pulled T.H. across the bed and onto the floor so that her body was across the bed and her knees were on the floor. T.H. testified that defendant put his penis on her backside. According to T.H.'s testimony defendant untied her hands and retied them in front of her.

T.H. further testified that defendant sat on the edge of the bed and put T.H. on the floor on her knees and told her that if she bit him he would cut her in a place that would paralyze her. T.H. testified that defendant forced her to engage in oral sexual contact. Defendant held a knife to T.H. almost constantly during the offense. During the oral sex act T.H. could see through the pantyhose blindfold. She saw a scar on defendant that went from his groin toward his stomach. She was unable to see where the scar ended.

T.H.'s testimony was that defendant then made her get on the floor of her son's bedroom which was next to the bathroom. T.H. testified that defendant put her on her side, and he lay on his side. Defendant then attempted to have vaginal intercourse with her.

T.H. testified that she looked at defendant's face, which was only about a foot away from her face. T.H. saw that defendant's eyes were closed and that he was gritting his teeth. T.H. saw that his teeth were yellow and kind of "crudded." T.H. looked at defendant's face about five or six seconds, until she became afraid. She was afraid that defendant would open his eyes and see T.H. looking at him and kill her. T.H. testified that defendant made T.H. turn on her stomach. Defendant retied T.H.'s hands behind her back. T.H. noticed scissors on the floor next to where they were lying. Defendant moved the scissors and told T.H. that he hoped she would not "try anything."

According to T.H.'s testimony defendant then took T.H. to her son's bed, put her on her stomach, and again had sex with her. T.H. began to scream and told defendant that it hurt. T.H. testified that with the knife at her back defendant forced her to go to her bedroom. T.H. heard children in the hallway and told defendant that he had better leave or someone would see him. According to her testimony T.H. told defendant that she had a typewriter in her closet and that he should just take it and go. T.H. testified that defendant said he had not come there for that. In T.H.'s bedroom defendant put T.H. on her back, got on top of her, and forced her again to have sex with him.

T.H. testified that defendant then took her back to her son's room. T.H. told defendant that she had to use the bathroom, so defendant put T.H. on the toilet. Defendant went into Nicholas' room to get a cigarette. T.H. testified that defendant lit one, gave it to T.H., and told her that she might need it. Defendant put T.H. face down on the bathroom floor and had anal intercourse with her.

According to T.H.'s testimony defendant then put her on her son's bed again. T.H. testified that defendant could not keep an erection, and T.H. could tell that it was making him angry because his tone went from calm to loud. Defendant put T.H. on the floor on her

knees and again shoved T.H.'s face into his crotch. According to T.H.'s testimony defendant called T.H. a "fat white bitch" and told T.H. that if she bit him, he would kill her. He then smacked T.H. on one side of her face and then smacked her on the other. T.H. testified that defendant put T.H. on the bed and engaged in anal intercourse. T.H. testified that she began to cry because it hurt. When defendant told her, "Maybe this will loosen you up," T.H. felt something cold and hard going into her ear. She smelled beer and realized that she had not finished the beer that Marie had given her. Defendant poured beer all over Nicholas' bed.

T.H. testified that defendant then put a bag in her mouth and gagged her to the point where she cried. T.H. tried to scream and tell defendant to remove the gag because she could not breathe. T.H.'s testimony was that defendant removed the gag and told her if she lay there quietly, he wouldn't put it back on. T.H. testified that defendant put a pillow on T.H.'s head and for about five minutes she was pleading with defendant to remove the pillow because she could not breathe. T.H. did not try to move because she did not know if defendant was still there.

When defendant did not answer her, T.H. wiggled the pillow off her head and sat up. T.H. looked through her apartment to make sure defendant was not still there. Initially, T.H. did not notice anything missing from her apartment, but she remembered that defendant had told her that he was in her apartment the previous night and had drunk a bottle of Gordon's gin. Defendant told T.H. that he came through the window. However, he also told her that it was stupid of her to leave her door unlocked. T.H. testified that defendant told her that he did not think that she would be in the apartment that morning. T.H. noticed that defendant had taken money from her purse and food stamps that were next to the television in her son's room.

When T.H. finished dressing, she ran across the street to the store that her boyfriend owned. She spoke to her boyfriend and they contacted the police. T.H. spoke with Detective Patricia Delgado. Detective Delgado took T.H. to the hospital. Detective Delgado asked T.H. if she could describe the offender. According to T.H.'s testimony she described him as a black man with short hair, about $1^1/2$ inches long. T.H. said that the offender had brown, bloodshot eyes and wore a black silky shirt and black pants.

T.H. further stated that defendant had bad breath, yellow teeth, and a scar on his stomach coming from his groin. T.H. guessed defendant's weight to be close to hers at 190 or 200 pounds. She guessed his age to be 30 or 35 years and his height to be average

height, around six feet. T.H. could tell that defendant was not short, but she could not tell exactly how tall defendant was. T.H. never stood face to face with defendant, as he was always behind her when they were standing. T.H. testified that defendant had a mustache and dark stubble, although she could not remember whether she told the police about the mustache or whether she was even asked about the mustache.

T.H. testified that another detective, Detective Arlene Stampnick, interviewed her. T.H.'s testimony concerning the description she gave to Detective Stampnick was consistent with her testimony concerning the description she gave to Detective Delgado. She added that defendant had a smell of alcohol about him and that his voice had a slight southern accent. T.H. agreed that it could have been a Cajun accent. T.H. testified that she told Detective Stampnick that defendant had been at her apartment for about three hours. T.H. figured that defendant had awakened her at 7 a.m. because it was approximately 10 a.m. when T.H. arrived at the grocery store. T.H. also told the detective that defendant had been in the bathroom touching certain things.

T.H. then went back to her apartment with Detective Stampnick. The police who accompanied T.H. took pictures of the apartment for evidence. T.H. found the knife that defendant used underneath some clothes in her apartment.

On July 30, 1991, T.H. went to the police station at Grand and Central Avenues. There she met with Detective Stampnick, who gave T.H. some photo books to look through. She recognized a picture of defendant as the assailant. She noticed that his face was thinner and his hair was longer in the picture. T.H. testified that she told the detective that defendant's hair had been cut and he had gained weight since the photo was taken. T.H. testified that she was sure she identified the right person. But she continued looking through that photo book and another book as well because "I was thinking maybe there was another photo of him."

T.H. testified that she told Detective Stampnick that her assailant claimed to have used her telephone.

The State also presented testimony from Detective Patricia Delgado. Detective Delgado testified that she was working alone on July 28, 1991, at approximately 10:30 a.m. when she received a call regarding a sexual assault. Detective Delgado went to 3242 West Armitage and found the victim, T.H., in a grocery store. Delgado asked T.H. to come to the squad car so that the detective could take T.H. to the hospital. Delgado and T.H. rode alone in the squad car. When Delgado realized that the rape had just occurred, she asked

T.H. to describe the attacker. Delgado's testimony as to how T.H. described the man in question was consistent with T.H.'s testimony. Delgado testified that T.H. told her about the scar on defendant's groin area. Delgado did not recall asking T.H. about any other unusual marks.

The State also presented testimony from Detective Stampnick. Detective Stampnick received a sexual assault assignment on July 28, 1991, at approximately 10 a.m. Detective Stampnick went to Saint Elizabeth hospital where T.H. was. The detective noticed abrasions on T.H.'s wrists and superficial scratches on her back. When Detective Stampnick spoke with T.H., she noticed that T.H. was visibly upset; T.H. "tended to cry a little bit." However, according to the detective's testimony, T.H. was willing and able to tell what happened.

Detective Stampnick received a copy of Detective Delgado's case report at about 11 a.m. Detective Delgado's report did not indicate that defendant had a mustache and Detective Stampnick did not recall whether T.H. told Detective Stampnick about a mustache. Detective Stampnick went over the report with T.H., verifying the information. Detective Stampnick's testimony as to how T.H. described the defendant was consistent with the testimony of T.H. and Detective Delgado. Detective Stampnick testified that when she asked T.H. about any marks or tattoos on defendant, T.H. said that she did not remember any tattoos but she did remember a scar on the abdomen and groin area. Detective Stampnick testified that T.H. told her that defendant had talked to T.H. during the rape. T.H. described his voice as having a southern accent, but she could not quite place the accent. When Detective Stampnick asked if the accent could be New Orleans or Cajun, T.H. responded that it was possible.

Detective Stampnick testified that although T.H. did not want to go back to her apartment, she went back with Detective Stampnick. Detective Stampnick recovered a beer bottle from the apartment, but when she dusted it for prints, no suitable prints were found.

On July 30, 1991, Detective Stampnick arranged for T.H. to come into the police station to look at photo books to find a picture of defendant. Detective Stampnick gave T.H. a photo book of recently released prisoners since defendant told T.H. that he was recently released from the penitentiary. T.H. sat at a table next to a partition that was used to keep the civilians from coming into the police work area. Detective Stampnick gave T.H. four books to look through.

Detective Stampnick returned to the table where T.H. was sitting to see if T.H. was having any luck finding the offender. T.H. pointed to the picture of defendant and told the detective that he was the

person who raped her. Detective Stampnick did not recall T.H.'s exact words, but she remembered T.H. saying that defendant was the man who raped her. Detective Stampnick testified that T.H. said that she was sure that he was the man. Detective Stampnick's testimony corroborated T.H.'s testimony that she told Stampnick defendant's hair was different in the picture. In the picture defendant wore his hair in braids. At the time of the incident, according to T.H., his hair was shorter and closer to his head.

Detective Stampnick testified that she learned that defendant had been arrested on other charges and had a court date pending. She further testified that when she learned that the arresting officer was Officer Basak of the University of Illinois campus police, she called Officer Basak and asked him to assist in the arrest of defendant for the crimes charged.

Defendant was then arrested and brought to the Area Five police station. When he was brought into the station, his hair was close to his head. When Detective Stampnick spoke to defendant, defendant told her that he was 6 feet 1 inch and weighed 185 pounds. The detective saw that defendant's eyes were brown and that his hair was black. She testified that she observed the defendant's abdominal scar. She testified that the scar went from his abdomen to his groin. The detective also learned defendant's address in De Kalb by looking at his "rap sheet." The detective stated that she had spoken to several people in De Kalb who knew defendant.

On cross-examination Detective Stampnick testified that she remembered T.H. told her that the assailant claimed to have used her telephone. She testified that she had not included this information in her written reports. Nor did she make any effort to obtain the phone records.

The court viewed defendant's scar and noted for the record that he "has a scar running down say from the right down the middle of his stomach from the rib cage down to his groin area."

The State also presented stipulated testimony from Christine Braun. The parties stipulated that if Christine Braun were called to testify, she would testify that she is an expert serologist with the Chicago police department's crime lab. On April 6, 1992, vaginal swabs, vials of blood, and saliva samples were received through a Vitullo Kit from T.H. The test showed that semen was present on one swab and that T.H. had type B blood. The blood testing was not indicative of secreter status, and the saliva tests showed type B blood and secretor. Christine Braun would also testify that blood and saliva samples were taken from defendant at Cermak Hospital. The tests showed that defendant had type O blood and that the test was

indicative of a nonsecreter. The conclusion reached was that the tests did not include or exclude defendant as the perpetrator.

At the close of the State's evidence, defendant moved for a directed verdict. The court denied the motion and defendant presented evidence by way of stipulation. The parties stipulated that defendant suffers from vitiligo. Vitiligo is defined as acquired cutaneous affliction, characterized by milky white patches, surrounded by areas of normal pigmentation. The parties further stipulated that on April 14, 1991, defendant was examined at Cook County Hospital and that he suffered from the condition on that date. It was also stipulated that the condition is present on defendant's penis.

Defendant produced testimony from Robert Goldsmith (Goldsmith). Goldsmith is married and has four children, one of whom is defendant. Goldsmith used to live in Chicago, but he now lives in Glenwood, Illinois. Defendant lived with his parents and grew up in Chicago. Defendant also lived with his parents in Glenwood for some time. In July of 1991, defendant lived in De Kalb, Illinois. Goldsmith never visited defendant in De Kalb and does not know how long defendant has lived in De Kalb. Defendant last lived with Goldsmith on a regular basis about eight or nine years ago.

Occasionally, Goldsmith would provide financial support to his son. In late July of 1991, Goldsmith's family sent a money order to defendant in De Kalb. The money order was issued on July 27, 1991, from a currency exchange in Chicago and was cashed at a tavern in De Kalb. Goldsmith speculated that it takes about an hour to get to De Kalb from certain points in Chicago.

Defendant also entered a stipulation from the keeper of records of Cook County Department of Corrections. The parties stipulated that the keeper of records would testify that exhibit 4 (a photo of defendant) is a true and accurate photo of defendant on August 2, 1991.

At the close of the evidence and arguments, the court found defendant guilty of all counts except three counts of aggravated criminal sexual assault and one count of armed robbery.

Defendant's position is that the State failed to disclose Ms. Dawn Larsen's name and address prior to trial even though she was a witness favorable to the defense and the defense had specifically requested such disclosure. Defendant argues that this nondisclosure violated the rule in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and denied defendant his due process right to a fair trial.

When the prosecution suppresses evidence specifically requested by the defense which is favorable to the defendant and is material either to guilt or to punishment the defendant's right to due process is

violated. (*Brady*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) The *Brady* rule has been codified in Illinois by Supreme Court Rule 412(c) (134 Ill. 2d R. 412(c)), which requires that following written motion of defense counsel:

"[T]he State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor."

However, "[t]his court has held that noncompliance with discovery requirements does not require reversal absent a showing of prejudice." *People v. Velez* (1984), 123 Ill. App. 3d 210, 219, 462 N.E.2d 746, citing *People v. Dunklin* (1982), 104 Ill. App. 3d 685, 688, 432 N.E.2d 1323, 1325.

■ *People v. Trolia* (1979), 69 Ill. App. 3d 439, 388 N.E.2d 35, sheds light on the meaning of "specific request" for purposes of the *Brady* rule. In *Trolia* the defendant requested:

"That the prosecution disclose to the defense the names and addresses of any witness or witnesses that may be or would be favorable to the defense. These witnesses to be clearly and separately identified on the List of Witnesses. The same disclosure is requested of any physical evidence or scientific evidence that might be or would be favorable to the defense." (69 Ill. App. 3d at 448.)

The court determined that this request was specific. In the case at bar defendant made his request using precisely the same language. Following *Trolia*, defendant made a specific request.

However, the burden of establishing a *Brady* violation is on the defendant (*Velez*, 123 Ill. App. 3d 210, 462 N.E.2d 746), and it remains to be determined whether the defendant can demonstrate: (1) that the information was material and (2) that the information was favorable.

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*United States v. Bagley* (1985), 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383.) Moreover, applications for a new trial on the ground of newly discovered evidence are looked upon unfavorably. (*People v. Miller* (1980), 79 Ill. 2d 454, 404 N.E.2d 199.) "The matter is largely discretionary with the trial court, and the exercise of its discretion will not be disturbed except in case of manifest abuse." (*Miller*, 79 Ill. 2d at 465.) Defendant claims Ms. Larson would have testified that she saw him. However, defendant's attorney conceded

that Ms. Larson did not tell the assistant State's Attorney that defendant stayed with her during the incident in question. The trial judge here observed in the record that the affidavit mentions no specifics that were revealed to the State "other than that she [Ms. Larsen] had seen him, [defendant] not that he stayed with her or any specific dates or anything of that nature." Taken as a whole the trial judge's comments reveal that the court did not believe that the affidavit established a credible alibi. Even if we were to believe the allegations contained in the affidavit, those allegations do not establish that the State ever learned that Ms. Larsen was able to provide an alibi for defendant. Here defendant did not show that any evidence which would probably have changed the outcome on retrial was suppressed.

■ Having concluded that the evidence which defendant complains was improperly suppressed would not have changed the outcome of the trial, it follows that defense counsel's failure to adduce such evidence at trial cannot support defendant's ineffective assistance of counsel claim. Where the errors defendant alleges trial counsel committed did not prejudice defendant, he cannot prevail on his claim for ineffective assistance of counsel. *People v. Caballero* (1992), 152 Ill. 2d 347, 604 N.E.2d 913.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MURRAY, P.J., and COUSINS, J., concur.