THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN TROLIA, Defendant-Appellant.

First District (5th Division)    No. 80-2322

Opinion filed June 11, 1982.—Rehearing denied July 21, 1982.

James J. Doherty, Public Defender, of Chicago (Matthew J. Beemsterboer and Richard S. Schiffrin, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and David A. Shapiro, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

This is defendant's second appeal from a murder conviction for which he received 25 to 75 years' imprisonment. In the first appeal, *People v. Trolia* (1979), 69 Ill. App. 3d 439, 388 N.E.2d 35, we reversed and remanded for a new trial finding that the State failed to disclose a material, potentially exculpatory statement by defense witness, Rebecca Lavin, which was in police possession during the trial. In this appeal, defendant presents these issues for review: (1) the trial court's denial of his pre-trial motions deprived him of a fair trial; (2) he was not proven guilty beyond a reasonable doubt; (3) the trial court's refusal to grant a continuance was an abuse of discretion; (4) the trial judge's failure to recuse himself or to grant a motion for substitution of judges for cause was reversible error; (5) it was reversible error for the court to deny defense motion *in limine* barring the prosecution from impeaching Rebecca Lavin with her 1980 conviction; (6) his right to effective cross-examination was unduly restricted; (7) it was error to admit his prior testimony from the first trial as a judicial admission and then to allow impeachment on a collateral matter; (8) he was not allowed to call certain witnesses; (9) the failure to give a tendered instruction by defense was prejudicial error; (10) it was error to restrict defense counsel's closing argument to one hour; and (11) the prosecutor's closing argument was inflammatory and prejudicial. The pertinent facts follow.

### State's Case

Patrick Castellaneta testified that he was part owner of the Godfather Lounge where the deceased, Paula Popik, had been employed for approximately three months. On August 31, 1974, he worked at the lounge from 6 p.m. to 4 a.m. and Paula worked the front bar from 8 p.m. to approximately 4 a.m. She was wearing a black halter top and hot pants. She was paid in cash at 4 a.m. and he never saw her again, although she was scheduled to work the following day. Paula's brother came in on September 3, looking for her.

Linda O'Neill testified that in August 1974 she worked at the On-The-Rocks Lounge. On August 31, 1974, she worked at the lounge from 10 p.m. to 5 a.m. the next day. She saw defendant at about 4:45 a.m. in the bar with a young lady who was wearing a black halter top and dark pants.

She arrived home from work at approximately 5:30 a.m. and was awakened by defendant knocking on the door at about 8:30 a.m. asking if he could stay. He went to the couch, and she went back to bed.

She saw Paula's photo in a newspaper approximately two weeks later. She identified the photo as being a picture of the girl she saw with defendant. Police first contacted her in December 1974 about the Popik murder. She tried to protect defendant but later decided to tell the truth

to assistant State's Attorney Ficaro, with whom she had attended grammar school.

On cross-examination, Linda stated that when defendant arrived at the house she neither smelled gasoline on him or saw any bloodstains on his clothing. She did not see defendant and the girl in a group that night and did not see them leave. She also stated that Investigator Leubscher made threats to take her kids away and that she would do almost anything to protect her children.

Thomas P. O'Neill testified that he is the husband of Linda O'Neill. Defendant came to their house between 6 and 6:30 a.m. and asked if he could sleep there. Linda woke him up to ask if defendant could stay. Richard "Animal" Maskas also spent the night at the O'Neill household. After they all got up that morning, they went up north to buy some drugs.

O'Neill next saw defendant the following Tuesday. Bob Holwell was also there. Defendant told them that he shot a Mexican and a girl. O'Neill also thinks defendant said he threw the girl over a bridge and got rid of her car. Holwell asked defendant where he got the gun and he replied that he got it from "Animal" Maskas. O'Neill agreed to be defendant's alibi.

On September 12, 1974, at the On-The-Rocks Lounge, O'Neill told defendant that he could not be his alibi. Defendant then confessed that there was no Mexican, just a girl. O'Neill was questioned by police on September 19, 1974, and told police defendant was not by his house on August 31. A few days later his wife noticed a picture in the paper of the slain girl who was with defendant.

On cross-examination, he testified that defendant did not state that he had burned Paula's car. He also stated that Investigator Leubscher had threatened to charge him with conspiracy to commit murder. Further, he lost his job and implied that Leubscher's frequent visits to question him might be the reason.

Robert Holwell testified that on September 1, 1974, defendant, the O'Neills and "Animal" Maskas were at his house. Defendant indicated at that time that he needed an alibi but he did not elaborate. On September 3, defendant told him and Tom O'Neill that he had killed a Mexican and a girl and had dumped their bodies in the river, burned a car, and walked to the O'Neills'. Defendant indicated that he had gotten the gun from "Animal" and returned it.

On September 11, 1974, Holwell saw his brother, a police sergeant, who stated that a girl's body had surfaced and asked him what he knew. He told his brother that there had been a dope ripoff and two people had been killed and had been thrown in the river. He told his brother to get in touch with "Animal" for more information. When he met O'Neill and defendant at the On-The-Rocks Lounge the next day, he told defendant he could not provide an alibi.

Holwell admitted that he had lied to the police to protect himself. He also believed that telling his brother about "Animal" and the gun would lead to defendant.

Michael Corbett, police chief of Willow Springs, Illinois, testified that he and Sergeant Steve Scarno recovered Paula's body from the Des Plaines River on September 6, 1974. Her body was unclothed except for a black halter top around her neck and two black high heel shoes on her feet. He also observed a tattoo on the lower right abdomen. He indicated that when he put a rope around the arms of the body, they were limp.

William Dado, an evidence technician, testified that in observing the body, it showed signs of bloating in the face and abdominal region, discoloration throughout the torso and extremities of the body, and skin slippage throughout the entire body. He also noticed a puncture-type wound to the right temple area at the hairline, a laceration of the right cheek area, the bridge of the nose and on the upper lip. He did not notice any rigor mortis.

David Brundage is a firearms examiner for the Illinois Department of Law Enforcement. He examined certain bullets removed from the body of decedent and concluded that they could have been fired from the gun introduced into evidence, but there were insufficient individual characteristics.

Dr. Joseph Claparols, a pathologist, testified that he conducted an autopsy on Paula and completed a protocol. An examination of her body revealed the palms of her hands and the soles of her feet were wrinkled and white from immersion in water. The skin of her body showed desquamation caused by blistering and peeling of the superficial layers of the skin. There was a reddening of her external genitalia. He did not record any bloating of the skin in the neck area. He observed lacerations on the face, on the bridge of the nose, right cheek and left upper lip. He also saw a fracture of the nose. Those injuries could be pre-mortem but most of the bloating is post-mortem. There was a pink staining of the inner lining of the heart, caused by breakdown of hemoglobin. This stain was post-mortem. It was his opinion that the cause of death was a bullet wound to the head, with laceration of the brain.

On cross-examination, he stated that he did not actually weigh or measure the body and that his protocol indicated minimal rigidity of the lower extremities.

Sworn testimony of defendant was then read to the jury from the May 10, 1976, trial. That testimony indicated that defendant went to a wrestling match on August 31, 1974. He denied he knew Paula or that he saw her in the tavern. He also denied having borrowed the gun from "Animal."

Leo Breen, Chicago White Sox treasurer, testified that business

records of the White Sox indicated that a baseball game took place the night of August 31, 1974. A wrestling match was held at Comiskey Park on September 7, 1974.

*Defense Case*

Dr. Cedric Keith Simpson, a pathologist and professor of forensic pathology, testified that in his opinion it was impossible for Paula to have been killed on September 1. He estimated that she died between September 3 and 4 after reviewing various materials concerning the decedent, including a factual summary, the protocol and numerous photographs.

Dr. Simpson noted that the protocol stated "external examination shows minimal rigidity of the lower extremities," the cause of which is rigor mortis which begins in the face and gradually works its way down the body. It passes the same way with the entire process generally taking between 30 and 36 hours. He also stated that her eyes looked quite white in the photographs he examined, and had she been in the water 5-6 days, they would have looked almost purple. Further, he noticed that the degree of decomposition was slight, as evidenced by the early stages of marbling, the lack of discoloration in the flanks, and the lack of distension of the abdomen.

On cross-examination, he testified that he did not observe bloating in the region of the face but rather swelling due to pre-mortem injuries. He also stated that he had not previously seen a live photograph but that he didn't need to in order to know that her body did not look bloated.

*Rebuttal*

Dr. Russell Fisher, chief medical examiner of Maryland and professor of forensic pathology, testified in rebuttal that he agreed with Dado's observation that when the body was recovered rigor mortis had passed. According to Fisher, the signs of decomposition included advanced softening of the surface of the body, swelling and bloating of the face and neck, discoloration of the skin, the falling apart of the brain, and in particular the brain stem being torn off, all of which was consistent with the decedent having died on September 1.

*Surrebuttal*

Dr. Robert Stein, chief medical examiner of Cook County, testified that based upon his examination of the photographs and protocol, the body had been dead for 2 to 3 days when it was found. Stein did not find putrefaction of the brain, pancreas, liver or stomach. He also did not find any bloating and noted that the black eye he observed was a pre-mortem injury.

On cross-examination, Stein stated he was given some written reports and some verbal ones from defense attorneys and he was not shown a live picture of decedent. He did not see the toxicology report and he was not shown Dr. Claparol's testimony.

OPINION

I

Defendant first contends that the trial court's denial of his pretrial motions violated his constitutional rights. He argues that his motion for discharge on the grounds of double jeopardy by virtue of prosecutorial overreaching should have been granted. He supports this charge by alleging that the prosecution (1) concealed Rebecca Lavin's statement that she had seen Paula alive on September 3 until after the first trial was over, (2) suborned perjury, particularly from three key State witnesses, and (3) practiced a deception in presenting and arguing the medical testimony at trial.

The double jeopardy clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." When a court has acquitted a defendant of the offense charged, this principle is controlling. (*Arizona v. Washington* (1978), 434 U.S. 497, 54 L. Ed. 2d 717, 98 S. Ct. 824.) However, reprosecution for the same offense is permitted where defendant wins a reversal on appeal of a conviction. The determination to allow reprosecution upon reversal "reflects the judgment that the defendant's double jeopardy interests, however defined, do not go so far as to compel society to so mobilize its decisionmaking resources that it will be prepared to assure the defendant a single proceeding free from harmful governmental or judicial error. * * *. For the crucial difference between reprosecution after appeal by the defendant and reprosecution after a *sua sponte* judicial mistrial declaration is that in the first situation the defendant has not been deprived of his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal." (*United States v. Jorn* (1971), 400 U.S. 470, 484, 27 L. Ed. 2d 543, 556, 91 S. Ct. 547, 556-57.) By statute in Illinois, reprosecution is allowed "if subsequent proceedings resulted in the invalidation, setting aside, reversal, or vacating of the conviction." (Ill. Rev. Stat. 1979, ch. 38, par. 3—4(d)(2).) This provision is in accord with judicial decisions. *People v. Benson* (1962), 24 Ill. 2d 159, 180 N.E.2d 482; *People v. Keagle* (1955), 7 Ill. 2d 408, 131 N.E.2d 74.

Defendant's allegations of prosecutorial overreaching is not supported in the record before us. The Lavin statement which defendant did not possess at the first trial was available at his second trial; thus it appeared to be a matter of trial strategy that Lavin was not utilized as a witness at the second trial. Likewise, the suborned perjury allegation is not supported in

the record before us. Furthermore, testimony concerning the time of decedent's death was elicited from a number of witnesses, both lay and medical, and not necessarily an example of prosecutorial overreaching for failing to ask the pathologist the time of decedent's death. In any event, defense did have the opportunity on cross-examination to elicit this information.

■■ We believe the double jeopardy clause is inapplicable as support for this motion and thus it was properly denied and reprosecution properly allowed.

Defendant also asserts that his motion for discharge by reason of the denial of the right to a speedy trial ought to have been granted. The sequence of dates enumerated by defendant to support this charge are:

| | |
|---|---|
| June 2, 1976 | Lavin statement found |
| July 14, 1976 | Motion for new trial denied |
| February 9, 1978 | Post-trial relief denied |
| February 23, 1979 | Appellate court reversed conviction |
| May 31, 1979 | Supreme Court of Illinois denied State's petition for leave to appeal |
| October 9, 1979 | Supreme Court of United States denied the State's petition for a writ of *certiorari* |

The mandates were finally issued to the trial court on October 29, 1979. Defendant believes that the over 5 years' delay from the indictment resulted from prosecutorial overreaching and was further compounded because in the second trial, the court ruled that Lavin's 1980 conviction for embezzlement could be used by the prosecution for impeachment. Thus, he asserts he suffered substantial actual prejudice as a result of the delay caused by the prosecution.

The period of time during which a convicted accused pursues an appeal which results in a new trial has no bearing on whether he received a speedy trial under both the United States and Illinois constitutions. *People v. Knippenberg* (1979), 70 Ill. App. 3d 496, 388 N.E.2d 806.

■■ Thus, defendant's pursuit of his constitutional right to appeal effectively tolled the speedy trial statute. Moreover, the State is entitled to pursue its petition for leave to appeal the reversal of defendant's conviction (Ill. Rev. Stat. 1979, ch. 110A, par. 315(a)); and the period during which an appeal by the State is pending is not counted for the purpose of determining whether an accused is entitled to discharge under the speedy trial statute (Ill. Rev. Stat. 1979, ch. 110A, par. 604(a)(4)).

■■ Under the cited authority, there is no basis to support the denial of the speedy trial motion. Further, after the issuance of the mandate the matter was continued by agreement to allow the prosecution time to re-investigate the case and the defense to file pretrial motions. As such,

defendant's acquiescence in these continuances tolled the statute. (*People v. Kuczynski* (1965), 33 Ill. 2d 412, 211 N.E.2d 687; *People v. Bivins* (1981), 97 Ill. App. 3d 386, 422 N.E.2d 1044; Ill. Rev. Stat. 1979, ch. 38, par. 103—5.) Further, defendant has failed to establish any prejudice to him because of his allegations of delay. He asserts that Lavin's 1980 conviction for embezzlement could be used by the prosecution for impeachment. However, since he did not call Lavin as a witness in his second trial, the prejudice he asserts is illusory as opposed to actual and substantial. Thus, this motion was also properly denied.

Defendant next contends that his motion for appointment of a special prosecutor should have been granted. The basis of defendant's motion is that "possibly favorable evidence may have been intentionally withheld, perjured testimony may have knowingly been used, perjured testimony may have been suborned at the original trial and that such conduct may have continued since then."

■■ The appointment of a special prosecutor involves the exercise of judicial discretion in the determination of whether a contingency authorizing the exercise of such power has arisen. (*Armentrout v. Dondanville* (1979), 67 Ill. App. 3d 1021, 385 N.E.2d 829; Ill. Rev. Stat. 1979, ch. 14, par. 6.) Upon the record, we cannot say that the court abused its discretion in the denial of the petition. Defendant's allegations are speculative and find no support in the record.

Further, it appears that the statute which defendant relies on is only applicable in two instances: (1) where the State's Attorney is interested as a private individual; and (2) where the State's Attorney is an actual party to the action. (*Environmental Protection Agency v. Pollution Control Board* (1977), 69 Ill. 2d 394, 372 N.E.2d 50.) Since neither of these situations in the instant case is applicable, this motion was properly denied.

■■ Concomitantly, defendant states that his motions for discharge and for the appointment of a special prosecutor should not have been denied without an evidentiary hearing. It appears that memorandum in support of these motions was presented to the trial court for its consideration and the court heard arguments from both sides on these motions before denying them. We must surmise that the trial court's rulings on these motions were informed and there was no further necessity for more detailed hearings.

## II

Defendant contends that he was not proven guilty beyond a reasonable doubt. He attacks the credibility and weight afforded the testimony of three prosecution witnesses. He asserts they were all close associates

and suggests they may have fabricated their testimony. He also attempts to undermine and discredit the State's medical testimony.

The determination of a jury will not be set aside unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. (*People v. Tate* (1976), 63 Ill. 2d 105, 345 N.E.2d 480; *People v. Triplett* (1981), 99 Ill. App. 3d 1077, 425 N.E.2d 1236.) Further, it is for the trier of fact to determine the credibility of witnesses and the weight to be given their testimony, and where the evidence is conflicting a court of review will not substitute its judgment for that of the trier of fact. *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733; *People v. Tribett* (1981), 98 Ill. App. 3d 663, 424 N.E.2d 688.

In summary, the State's evidence disclosed that Paula disappeared on September 1, 1974, wearing a black halter top and hot pants. She was seen leaving the On-The-Rocks Lounge with defendant on this date. Defendant confessed to O'Neill and Holwell that he had killed a Mexican guy and a girl and had thrown their bodies into the Des Plaines River and burned their car. He borrowed the gun used in the murders from "Animal" Maskas. He later denied that he had killed a Mexican guy but did admit to killing a girl. Medical testimony corroborated the time of death as being September 1, 1974.

Defendant's evidence that Paula was alive after September 1, 1974, was the defense medical experts' testimony that Paula had been dead less than three days when her body was discovered. Defendant's other "evidence" that Paula was alive after September 1, 1974, would have been the Lavin statement that she saw Paula alive on September 3, 1974, at the Godfather Lounge where they both worked. However, defendant elected not to call Lavin as a witness at his second trial even though the nondisclosure of her statement at the first trial formed the basis for the remandment of this matter for a new trial. 69 Ill. App. 3d 439, 449-50.

In light of the established legal principles enunciated above, the jury could well have determined that defendant was guilty of decedent's murder. We cannot require the jury to search out various potential explanations compatible with innocence and raise them to the status of reasonable doubt. (*People v. Grice* (1980), 87 Ill. App. 3d 718, 410 N.E.2d 209.) The jury as the trier of fact was free to reject defendant's evidence and determine that the State's evidence was credible. We have carefully reviewed the record in this case and find that the evidence is sufficient to sustain defendant's conviction beyond a reasonable doubt.

### III

The third issue defendant raises is that the trial court's refusal to grant a continuance was an abuse of discretion. Defendant filed and argued

three motions on May 2, 1980, which were denied. The court then set the case for trial on June 9, 1980. After the transcript of the May 2 hearing became available, defendant filed a motion for leave to file a petition for an original writ of *mandamus* which was denied on June 6, 1980. Thereafter, on the day of trial, defense counsel's associates asked for a two-week continuance. The trial court continued the matter until the next morning. The next day, defense counsel Doherty came in and asked the court for a continuance, explaining that he was pursuing Federal remedies and the motions for discharge had occupied a great deal of time over the previous months as such that he had not completed preparations for trial.

The constitutional right to counsel incorporates the right to counsel with adequate time to prepare. (*People v. Massarella* (1979), 80 Ill. App. 3d 552, 400 N.E.2d 436.) However, the granting of a continuance rests in the sound discretion of the trial court. (Ill. Rev. Stat. 1979, ch. 38, par. 114—4(e).) A trial court's refusal to grant a motion for a continuance will not be disturbed on review absent a showing of a clear abuse of discretion. (*People v. Hayes* (1972), 52 Ill. 2d 170, 287 N.E.2d 465.) Unless it appears that the court's refusal to grant a continuance embarrassed the accused in preparing his defense or prejudiced his rights, the conviction should be affirmed. (*People v. Canaday* (1971), 49 Ill. 416, 275 N.E.2d 356.) A trial court's ruling on denying a continuance is evaluated on the facts and circumstances of the case and a defendant may be forced to trial where there is no showing of diligence. *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.

■■ Acknowledging both statutory and case authority allowing a trial judge discretion to deny a continuance, the facts of the instant case do not warrant an otherwise determination. This matter had been tried previously in 1974 with the same issues and essentially the same witnesses. Defense was aware of the trial date set one month before trial, but did not notify the court of the need for additional time until the day of trial. The trial judge held the case over until the next day which was when Mr. Doherty was expected to return from his vacation. We are not persuaded that defense counsel exercised due diligence in preparing this matter for trial from our examination of the record. Moreover, defendant has failed to establish how this denial of a continuance embarrassed or prejudiced his defense, as the record discloses that counsel participated vigorously at every stage of the trial. Thus, under the facts and circumstances of this case, we believe the trial court's denial of defendant's motion was a proper exercise of the court's discretion.

IV

Defendant then argues that the trial judge's failure to recuse himself or to grant a substitution of judges for the case, after making a derogatory

remark about defense-appointed counsel, was reversible error. The court denied making the derogatory remark, which denial is also supported by the prosecutor. The trial judge also noted for the record that defendant would receive a fair trial before him.

By statute in Illinois, a defendant may move at any time for substitution of a judge for cause, supported by affidavit. (Ill. Rev. Stat. 1979, ch. 38, par. 114—5(c).) Relief is proper, however, only if there have been no prior substantive rulings by the judge from whom a substitution of judge is sought. *People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208; *People v. Johnson* (1974), 24 Ill. App. 3d 152, 320 N.E.2d 69.

■■ In the pending matter, the judge had already made rulings on defendant's motions for discharge and denied his motion for a continuance. Thus, it would appear that the motion for substitution was untimely. Defendant was also not shown to have been entitled to an affirmative ruling on his motion where it appears that the purpose of the motion was not for the prejudice of the judge, but as an alternative motion for a continuance. In this instance, the motion for substitution was not made until after defendant's motion for a continuance, which involved a heated exchange, was denied. The totality of the circumstances indicate the motion for substitution was made for dilatory purposes; as such it was not error to deny it. *People v. Peterson* (1979), 70 Ill. App. 3d 205, 387 N.E.2d 951.

■■ Additionally, our review of the record fails to disclose that the trial court was prejudiced against defendant. The judge specifically stated that defendant would get a fair trial before him, and there is no indication otherwise, even though the determination of defendant's guilt was made by a jury. Moreover, defendant was offered the opportunity to orally argue his motion, which he declined. This afforded defendant a "hearing" within the meaning of the section authorizing the accused to move at any time for substitution of judge for cause. (*People v. Spurlark* (1978), 67 Ill. App. 3d 186, 384 N.E.2d 767.) The burden rests not upon the court to justify retention of the case, but upon the defendant to offer evidence that prejudice will result if his motion for substitution of judges is not granted. (*People v. Breitweiser* (1976), 38 Ill. App. 3d 1066, 349 N.E.2d 454.) Defendant has not met that burden in this matter.

## V

Another of defendant's contentions states that the trial court committed reversible error by denying his motion *in limine* to bar the prosecution from impeaching Lavin with her 1980 conviction for theft embezzlement. However, the record indicates that defense wanted to call Investigators Vanerio and Houlihan to testify that they took a statement from Lavin immediately after the body was discovered. The judge

denied the motion as Lavin was available to testify about her statements to the police. Defense then argued that Lavin's 1980 conviction could be used to impeach her and thus the new trial would not restore the status quo. Since the court's ruling was not specifically on the use of Lavin's conviction for impeachment purposes, but on allowing the investigators to testify instead, this is not a proper issue before us.

In any event, the dictates of *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, and subsequent authority, would allow evidence of a prior conviction if within 10 years from the date of conviction "or of the release of the witness from confinement, whichever is the later date." (*People v. Luna* (1980), 81 Ill. App. 3d 246, 248, 401 N.E.2d 662.) Consequently, if the court's ruling was on the use of Lavin's conviction, it was proper and the State could have used it as a valid impeachment device.

## VI

Defendant asserts that the trial court unduly restricted his right to effective cross-examination. Specifically, he claims error when the court granted the State's motion *in limine* (1) prohibiting defense from arguing to the jury the former trial and the reasons for its reversal, (2) the criminal history and character of Maskas and Leubscher, and (3) prohibiting defense from calling Maskas and Leubscher as court's witnesses.

The decision to limit the scope of cross-examination is within the discretion of the trial court, and on review this decision is not reversible error unless it involved a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Blackwell* (1979), 76 Ill. App. 3d 371, 378, 394 N.E.2d 1329.) Further, the use of the motion *in limine* is encouraged in criminal cases so as to exclude collateral or extraneous matters which can mislead or prejudice a jury. *People v. Devine* (1977), 55 Ill. App. 3d 576, 371 N.E.2d 22.

Applying the foregoing principles to the pending matter, it becomes readily apparent that mention of defendant's first trial and its reversal was irrelevant to the material issue in defendant's trial.

■■ Moreover, defendant has not cited any authority which would permit him to impeach Maskas by a prior conviction if he was not a witness at his trial. We are not persuaded that defendant was prohibited from presenting his theory of the case through the testimony of other witnesses.

## VII

Defendant argues that the court erred in admitting portions of his testimony at the first trial and permitting impeachment thereon. The prosecution introduced excerpts from defendant's first trial where defendant stated that he went to a wrestling match at Comiskey Park the

evening of August 31, 1974. Thereafter, a State witness testified that there was no wrestling match at Comiskey Park on the evening in question.

■■ We believe this evidence was collateral and reject the State's response that defendant's former testimony was falsely exculpatory. In any event, however, we believe the error in admission of this evidence was harmless, considering the preponderance of evidence introduced at trial establishing defendant's guilt. As was stated in *People v. Canity* (1981), 100 Ill. App. 3d 135, 145, 426 N.E.2d 591:

> " 'It is not our policy to reverse a judgment of conviction merely because error has been committed, unless it appears that real justice has been denied or that the verdict of the jury may have resulted from such error.' " See *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E.2d 347.

## VIII

Defendant contends that the trial court committed reversible error in preventing defendant from calling Investigators Houlihan and Vanerio to testify about the Lavin statement.

■■ We believe the ruling was correct as Lavin was available to testify and should have been called first as a witness. Defense chose not to call Lavin as a witness. Thus, to allow the investigators to testify as to the statement Lavin made to them to show that Paula was alive on September 3, 1974, would violate hearsay principles. *People v. Robinson* (1970), 46 Ill. 2d 229, 263 N.E.2d 57.

## IX

■■ Defendant also proposes that the court erred by failing to give an instruction tendered by defense calling attention to the State's failure to call two witnesses who testified at the first trial. At defendant's second trial the State did not call either Maskas or Leubscher, although they testified at the first trial. Defendant asserts that this raises a presumption that these witnesses would have testified unfavorably had they been called.

In a criminal prosecution, the State is not required to call every witness listed by it as witnesses who may be called in its case, and no adverse inference may be drawn from the State's failure to call an available witness. (*People v. Tillman* (1980), 82 Ill. App. 3d 430, 402 N.E.2d 825.) Furthermore, it is not error to refuse to give this instruction. *People v. Bracey* (1981), 93 Ill. App. 3d 864, 417 N.E.2d 1029.

In light of the above authority, the court properly rejected defendant's proposed instruction. Moreover, the defense was informed that the State would not be calling these witnesses; however, that did not preclude the defense from calling them as their witnesses.

## X

The trial court limited defense counsel's closing argument to one hour. Defendant contends this was error. It is within the trial court's discretion to impose a reasonable limit on the time for presenting argument to the jury. (*People v. Kane* (1980), 81 Ill. App. 3d 641, 401 N.E.2d 1310.) Moreover, defendant must demonstrate actual prejudice by the time limit imposed by the court. *People v. Hovanec* (1979), 76 Ill. App. 3d 401, 415, 394 N.E.2d 1340.

■■ In this instance, counsel did not request additional time nor is there any indication in the record that he did not address most of the relevant issues in the trial. Much of the testimony was cumulative in nature and defendant's brief is void of any important points he wished to make and did not have the opportunity to do so because of the time limitation. (See *United States v. Roviaro* (7th Cir. 1967), 379 F.2d 911.) Thus, the court's imposition of the one-hour time limitation for closing argument was not an abuse of discretion.

## XI

Lastly, defendant asserts that the prosecutor's closing argument was so inflammatory and prejudicial as to deny him a fair trial. He first posits that it was reversible error to accuse defense counsel of trickery and fraud. He cites the following:

"MR. THEOBALD: I believe that the defense in this case has intentionally made a calculated attempt to confuse you and to distort the issues in this case. And I will get to that later.

＊ ＊ ＊

But, there is, really, something interesting in the case, what the defense has done. They have deliberately calculated an attempt to defraud you in the defense that they presented.

MR. NUDELMAN: Objection, Judge.

MR. THEOBALD: And how did they do that?

THE COURT: Sustained.

MR. NUDELMAN: Thank you. Ask that the jury be instructed to disregard it.

MR. THEOBALD (continuing): In the following way. You heard the facts that they gave to Doctor Simpson. They didn't give him all the facts. They didn't tell Doctor Simpson about the observations of the police officers on the scene, what the police officers saw when they handled and touched the body. They didn't tell Doctor Simpson about Paula Popik having the same clothes on September 6, 1974, that she had on on September 1.

MR. NUDELMAN: Objection.

MR. THEOBALD: They didn't tell Doctor Simpson that Paula—

THE COURT: Denied. Okay.

MR. THEOBALD (continuing): That Paula Popik was scheduled to go to work the following day, and that she didn't go to work and that her whole family was all out there looking for her all over the place. They didn't show Doctor Simpson this."

And on rebuttal:

"MR. ANGAROLA: May it please the court, counsels, ladies and gentlemen of the jury: Mr. Doherty, ladies and gentlemen, wants you to believe that sincere appeal that you just saw. Well, ladies and gentlemen, I think that you're all too smart to observe it, to believe that. Mr. Doherty wants you to believe that supposed sincere appeal and you know what, ladies and gentlemen, maybe if you hadn't been here throughout the trial to see the changes in Mr. Doherty as his case went on, maybe you would almost be tempted to believe that for a moment, that supposed sincere appeal because, ladies and gentlemen, you saw this man change for whatever was appropriate.

The kind of country bumpkin lawyer on the cross-examination of Dr. Fisher. Was that the same man who put Dr. Stein on direct examination, the same man who cross-examined Dr. Fisher, didn't know any medical terms?

And, my God, lo and behold, all of a sudden those medical terms jumped to his lips. Hemotolysis. My God, that man that I saw cross-examine Dr. Fisher wouldn't have been able to say that word in a million years. Ladies and gentlemen, do not be fooled. Mr. Doherty would do whatever he could. Forget the sincere appeal, the sincere leaning forward and believe me, ladies and gentlemen, junk, because that is what it is.

You saw it. You saw the difference in cross-examination. Would Mr. Doherty try to dupe you? Absolutely, of course.

What about Mr. Noehre, if I pronounce his name correctly? Mr. Doherty was caught trying to dupe him. He was caught trying to dupe him.

\* \* \*

Well, you mean to say Mr. Doherty was acting? Ladies and gentlemen, he got caught right before your eyes and is that the only attempt to dupe you?

Mr. Theobald talked about Mr. Doherty duping the experts. That's one aspect of it. They were duped and I think all of you know and I think it's clear to all of you."

As a second instance of reversible error, defendant states that the prosecution argued that decedent had been molested when there was no evidence to support this claim.

Excerpts from the argument are:

"* * * he molested her and shot her in the head."

"* * * assaulted her and shot her in the head."

"* * * assaulted and shot her in the head."

"* * * molested her and shot her in the head."

"* * * the way she was molested * * *."

And finally defendant contends that the prosecution degraded the standard of reasonable doubt:

"MR. ANGAROLA: Ladies and gentlemen, the evidence in this case would convict any defendant anywhere beyond a reasonable doubt.

MR. NUDELMAN: Objection to that form of argument.

THE COURT: Sustained, sustained.

MR. ANGAROLA: Defense counsel would like to present, defense counsel would like to present proof beyond a reasonable doubt is some unobtainable goal.

MR. NUDELMAN: Objection, Judge.

THE COURT: Sustained.

MR. ANGAROLA: Every Court in the United States—

MR. DOHERTY: He is paying no attention to you now.

MR. ANGAROLA: How much the defense attorneys like to present that proof beyond a reasonable doubt is some masterpiece.

MR. NUDELMAN: Objection, I ask my objection be noted for the record at this time, Judge.

THE COURT: You may continue.

MR. ANGAROLA: How much they try to chip away with little chips."

It is well settled in Illinois that even though every defendant is entitled to a trial free from improper comments or arguments that engender prejudice, a verdict will not be set aside unless the remarks are clearly prejudicial, affecting the outcome of the case. (*People v. Roberts* (1981), 100 Ill. App. 3d 469, 426 N.E.2d 1104; *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.) In determining whether the remarks constituted prejudicial error, the test is whether the jury would have reached a contrary verdict had the improper remarks not been made. (*People v. Witted.*) Such remarks must either (1) constitute a material factor in defendant's conviction, or (2) result in substantial prejudice to the accused. *People v. Robinson* (1980), 91 Ill. App. 3d 1138, 415 N.E.2d 585.

In some instances cited as error, defendant's objection was sustained, thus curing any alleged error. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) In other instances cited, defendant failed to object, thus waiving the issue of these remarks on appeal. *People v. Grayson* (1980), 89

Ill. App. 3d 766, 411 N.E.2d 1177; *People v. Pleasant* (1980), 88 Ill. App. 3d 984, 411 N.E.2d 132.

■■ While a prosecutor is allowed wide latitude in closing arguments (*People v. Roberts*), there were instances of improper remarks which we cannot condone. However, because of the overwhelming evidence of defendant's guilt, none of these instances can be said to constitute a material factor in his conviction or to have resulted in substantial prejudice to him. Finally, the jury was instructed to disregard any matters to which objections have been sustained and admonished that closing arguments are not evidence. The jury being properly informed as to the performance of its duty thus further alleviated any potential harm. (*People v. Dowd* (1981), 101 Ill. App. 3d 830, 428 N.E.2d 894.) It is our belief that these arguments or remarks thus do not constitute reversible error.

Consistent with the aforementioned reasons, we affirm the judgment of the trial court.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.