THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FREDDIE GONZALEZ, Defendant-Appellant.

First District (2nd Division)   Nos. 82—1473, 82—1701 cons.

Opinion filed December 27, 1983.

DOWNING, P.J., dissenting.

James J. Doherty, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Lawrence R. Stasica, and Thomas J. Finn, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

A jury found defendant guilty of murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2)) and, after his motion for a new trial was denied, he was sentenced to 35 years' imprisonment.

On appeal defendant raises as issues whether the circuit court erred by: (1) denying him an adequate opportunity to prepare for trial; (2) prohibiting cross-examination of a State's witness as to his gang affiliations; and, (3) refusing to permit defendant to impeach his own witness with the witness' omission of certain facts from his police report.

On May 12, 1981, Michael Rodriguez, also known as "Monkeyman," was fatally shot near the intersection of Cleaver and Blackhawk Streets in Chicago. The following day, defendant was arrested and subsequently charged with murder and armed violence in connection with the slaying.

In its July 31, 1981, answer to defendant's motion for discovery, the State indicated that it might call as witnesses, among others, Robert Burden, "David Alonsa, aka Alonzo [sic]," and Mario Zuniga. Their addresses were not furnished. Defendant moved for specific discovery, under Supreme Court Rule 412(a)(i) (87 Ill. 2d R. 412(a)(i)), of the current addresses and pretrial production of Alonso and Zuniga, alleging that the State had relocated these witnesses following a preliminary hearing, and that they could not be located at the addresses and phone numbers provided by the State after repeated defense requests for such information. The State indicated that, as their whereabouts were unknown, it would introduce their preliminary hearing testimony at trial; noted a continuing investigation to locate the witnesses; and that defendant would be advised as soon as they were located.

Jury selection for the trial began on Friday, May 7, 1982. The State said it would "possibly" argue on the following Monday to interject evidence of gang membership into its case. On Monday, May 10, however, the issue of gang membership was not raised. On May 11, the State suggested that the court rule on the issue because it appeared to be an essential part of the defense theory. Defense counsel then argued that the case was "being put on our defendant," and that reference to gang membership was necessary to show the motive for the killing and to shed light on why witnesses would testify in a cer-

tain way. The State then observed that it was neither for nor against allowing references to gang membership and had prepared its case accordingly.

Defense counsel requested and received an *in camera* hearing out of the presence of the State so that it could explain to the court the importance of the gang issue to its theory of defense. Although this hearing is not recorded, defense counsel at the conclusion of its case recited the theory earlier presented: Gonzalez, recently father of a son, had allegedly withdrawn from gang membership and, as a result, had been harassed and threatened by gang "collectors" and "enforcers," Alonso and Zuniga. Gonzalez defied their requests to sell drugs for the gang and was told by Alonso and Zuniga that, unless he at least contributed to gang coffers, "they would get him." Defense counsel noted that this theory gave Alonso a motive to fabricate, especially since he was at the scene of the homicide for which he might himself be accountable. Nevertheless, the circuit court ·ruled that "[t]here is to be no reference to gang affiliations in this case."

Meanwhile, with respect to another issue, on May 10, defense counsel noted that he and co-counsel had interviewed witness Robert Burden in January 1982, at which time Burden said he could not identify defendant as the offender; as a result, Burden was scheduled to be a defense witness. An appointment to interview Burden at 9 a.m. on May 7 was made with Burden's mother. Counsel further related that Burden's mother was contacted by the State after the appointment was made, and when she advised the caller of the next day's appointment at 9 a.m. with defense counsel, she was told that the State would have her son picked up at 8 a.m., which was done. When defense counsel arrived at the designated time, they learned that Burden had been picked up an hour earlier. As Burden remained in State custody, defense counsel argued, an interview was needed because of indications that Burden's testimony might be different and might therefore warrant a change in defense strategy. The circuit court granted time for such interview before continuing with jury selection; at the same time, counsel was permitted an interview with Alonso, who had been in State custody since May 6.

On May 11, shortly before opening statements by counsel, the State remarked that it would present Burden as its own witness and that he would deny the substance of his earlier statement made to defense counsel. Defense counsel then moved for a continuance until the next day so that they could "restructure" the defense and possibly bring in another attorney. The court denied this motion and characterized counsel's dilemma as "simple," requiring "one or the other" to

withdraw from representing defendant in order to testify in rebuttal. Neither defense counsel withdrew.

Robert Burden, 14 years old at the time, testified for the State at trial. At about 7:30 p.m. on May 12, 1981, he was walking on Blackhawk toward a nearby park. He passed Monkeyman, whom he had known all his life, and crossed Blackhawk at its intersection with Cleaver. At that point he noticed three people in a gangway on Cleaver: defendant, Alonso and Zuniga. He had known Alonso and Zuniga two to three years; he "used to just see [defendant] a lot, I ain't know him." He observed defendant put something on his head, run across Cleaver and into the alley off Blackhawk. He lost sight of him for five to 10 seconds between buildings. When defendant reappeared, he pulled a gun and shot Monkeyman, on Blackhawk, four or five times, and then ran back the same way he had come. Burden was the first person to reach Monkeyman. He then went to call an ambulance. When he returned to the scene, police had arrived and Burden gave them an account of the crime and a description of the assailant. On cross-examination, Burden said he had spent the past four days in a hotel where he had shared meals with Alonso and discussed the case with police. There was no attempt to impeach Burden with his allegedly inconsistent statement to defense counsel made in January 1982.

David Alonso, age 19, also a State's witness, testified that at about 6:15 p.m. on May 12, 1981, he and Monkeyman played in a basketball game at a fieldhouse gym. He stepped out of the gym for a drink of water and saw defendant. In answer to defendant's question, he said that Monkeyman was in the gym, to which he then returned. After later leaving the gym, Alonso ran into defendant and Zuniga, who asked him to accompany them to a house on Cleaver to retrieve a tie. While in the gangway of the house, defendant handed his leather jacket to Zuniga. At this time Alonso observed Monkeyman cross from the southeast to the northwest corner of Cleaver and Blackhawk. Defendant put on a ski mask, ran west across Cleaver to the north alley of Blackhawk, and lowered the mask over his face. Alonso saw defendant run up behind Monkeyman and raise both hands; he then heard five or six shots. As Alonso began running south on Cleaver, he saw defendant, no longer wearing the mask, run back into the gangway. Defendant told Alonso and Zuniga later that he stashed the gun in a yard.

Daniel Noon, Chicago Police gang crimes specialist, testified that he was at the rear door of defendant's apartment when other officers knocked on the front door and identified themselves. As defendant started to walk out the back door, he was arrested. Police also recov-

ered a brown leather jacket during the arrest.

The only defense witness called, Chicago Police Detective Gary Bulava, testified that he interviewed Burden on the day of the homicide and filed a report on the case. Burden did not tell him then that he saw defendant in the gangway with Alonso and Zuniga prior to the shooting, nor that defendant ran west through the alley. On cross-examination, Bulava said that Burden told him he could identify the offender. On redirect examination, Bulava further said that Burden indicated that he knew the assailant from the neighborhood. When defense counsel attempted to inquire whether Bulava's police report contained this information, the State's objection was sustained. The court noted that omission from police reports cannot be impeachment and that Bulava's testimony was not inconsistent but merely provided added information prompted by further questioning.

Defendant was convicted and sentenced as first noted above.

## I

█ Defendant first contends that he was denied sufficient opportunity to prepare for trial because the State impeded defense preparations and the circuit court denied his motion for a short continuance. Motions for continuances in criminal cases are governed generally by section 114—4 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 114—4), which provides that such motions are directed to the discretion of the trial court and are to be evaluated in light of the movant's diligence. (See *People v. Dunigan* (1981), 96 Ill. App. 3d 799, 421 N.E.2d 1319.) The denial of such motion will be reversed only where there is a clear abuse of discretion. *People v. Hayes* (1972), 52 Ill. 2d 170, 287 N.E.2d 465; *People v. Trolia* (1982), 107 Ill. App. 3d 487, 437 N.E.2d 804, *cert. denied* (1983), 460 U.S. 1044, 75 L. Ed. 2d 798, 103 S. Ct. 1442.

The principal reasons given by defendant for the motion was his "surprise" at learning on the day trial began that Burden, who was intended to be a defense witness, was instead being called by the State to identify defendant as the offender. Defendant noted that this witness had been "snatched" by the State just prior to a scheduled follow-up interview with defense counsel; as a result, the defense was unaware of Burden's damaging testimony until the day this witness was to testify. Defendant asserts that a short continuance in order to "restructure" his strategy was therefore necessary to research the problem and possibly secure another attorney in order to impeach Burden with allegedly inconsistent statements made earlier to defense counsel by this witness. The State maintains, however, that it had re-

peatedly advised defendant that Burden would identify him at trial.

In order to rebut Burden's allegedly inconsistent testimony one of defendant's attorneys would have been required to withdraw from the case. Such a decision need not have necessitated extensive research or a delay in proceedings for which a jury had already been selected. The cases cited by defendant involve situations where time was needed to procure a rebuttal witness as a result of "surprise" testimony. (See *People v. Lott* (1977), 66 Ill. 2d 290, 362 N.E.2d 312; *People v. Kuczynski* (1961), 23 Ill. 2d 320, 178 N.E.2d 294.) Both possible rebuttal witnesses here were present in court. Further, unlike *Kuczynski*, the circuit court here offered to permit one of the attorneys to withdraw in order to testify. Because of their failure to do so, defense counsel's subsequent inability to respond to Burden's testimony cannot be attributed to the court's denial of their motion for a continuance.

■ Defendant also argues that his inability to interview Alonso until the day before trial, due to the State's bad faith, also merited a continuance. In the cases cited by defendant on this point, however, the witness at issue was not on the State's list of witnesses required under Supreme Court Rule 412(a)(i) (87 Ill. 2d R. 412(a)(i)). Moreover, the State was aware of the availability of the witness well before trial and in bad faith delayed until trial to announce that such witness would testify. *People v. Millan* (1977), 47 Ill. App. 3d 296, 361 N.E.2d 823; *People v. Mourning* (1975), 27 Ill. App. 3d 414, 327 N.E.2d 279.

In the instant case, Alonso was listed as a State's witness 10 months before trial and, in fact, testified for the State at a preliminary hearing. His whereabouts were subsequently unknown to both the State and defense until May 6, 1982. Although the State did not then immediately inform defendant that Alonso was in custody, defendant did interview him on May 10. Defendant knew that this witness would testify adversely to him, if at all, and was also aware of the substance of this testimony from the preliminary hearing. The State's delay in informing defendant of this witness' availability cannot be said to have so adversely impacted defendant's trial preparations as to merit a continuance.

■ Defendant argues that the State exhibited bad faith in initially seeking to have the issue of gang affiliation introduced in the case, only to back off on the day of trial when defendant moved to have such evidence admitted. Because the exclusion of such issue effectively eviscerated the theory of defense, defendant maintains, a continuance was mandated. This argument must also be rejected. On May 7, the State did not actually move to have this issue admitted, but indicated only that it might "possibly" argue for such admission,

although aware of the court's general opposition to the introduction of such evidence. Defendant's assumption, therefore, that the State supported his motion on May 11 to have such evidence admitted is without foundation. The State did not oppose defendant's motion, but said it would abide by the court's decision on the matter as, of course, defendant was also bound to do. Defendant's failure to prepare for the possibility that its motion would be denied, regardless of the State's support or opposition, was an insufficient ground to require a continuance. We find no error here.

## II

██ Defendant next argues that because the circuit court precluded him from cross-examining Alonso as to his gang affiliations, he was unable to impeach this witness as to his bias or motive to testify falsely. The right to cross-examine a witness as to his biases, prejudices, or ulterior motives, is protected by both the Federal and Illinois constitutions. (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. 1, sec. 8; see *Davis v. Alaska* (1974), 415 U.S. 308, 315-17, 39 L. Ed. 2d 347, 353-54, 94 S. Ct. 1105, 1109-11.) Such impeachment is "always relevant." (415 U.S. 308, 316, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110.) The widest latitude should be allowed defendant when pursuing cross-examination to establish bias or motive. *People v. Garrett* (1976), 44 Ill. App. 3d 429, 436, 358 N.E.2d 364.

The State maintains, however, that the court properly curtailed cross-examination in this matter since any testimony thus elicited would have been hearsay. (*People v. Garcia* (1981), 103 Ill. App. 3d 779, 783-84, 431 N.E.2d 1234.) Were Alonso to have testified to threats made against defendant and his family by others, such testimony would have been hearsay; the same cannot be said where Alonso would have been asked about threats he personally made. The defense proposed to show that Alonso was a collector for a gang defendant had quit. Through cross-examination the defense would have attempted to prove that Alonso personally directed threats against defendant, his mother, sister, wife and children unless defendant remained a gang member. The answers to such questions on cross-examination would have gone to Alonso's bias and motive to testify falsely, not to the truth of the matters asserted, and would have been admissible.

The State's further argument that, because the issue in the case was identification, evidence of gang membership would have been collateral and therefore properly subject to restriction, must likewise be rejected. Although the court's refusal to admit substantive evidence of

gang affiliation may have been correct absent the alleged personal involvement of Alonso in making these threats (see *People v. Renslow* (1981), 98 Ill. App. 3d 288, 293-94, 423 N.E.2d 1360; *People v. Lewis* (1976), 38 Ill. App. 3d 995, 998, 349 N.E.2d 528), the same rationale does not apply to cross-examination for personal bias or motive. As has been observed, "[i]nquiries of a witness as to his relations with the accused, his interest in the results of the case, and his feelings of bias, are never collateral." *People v. Garrett* (1976), 44 Ill. App. 3d 429, 437, 358 N.E.2d 364.

The error in restricting the scope of the cross-examination of Alonso with respect to his gang affiliation was not harmless. In *People v. Wilkerson* (1981), 87 Ill. 2d 151, 157, 429 N.E.2d 526, the supreme court posited a three-part test for determining whether errors in cases involving restricted cross-examination are harmless beyond a reasonable doubt: (1) the error contributed to the conviction; (2) other evidence in the case overwhelmingly supports the conviction; and (3) the evidence is merely cumulative or duplicative of properly admitted evidence.

■ Application of the *Wilkerson* criteria to the instant facts reveals, first, that harm resulted because the evidence at issue—Alonso's testimony untested as to bias or motive—substantially contributed to defendant's conviction. Secondly, the other evidence supporting conviction essentially consisted of Burden's eyewitness testimony; there was no physical evidence, except for defendant's leather jacket, linking defendant to the crime. The jacket was significant only as it related to Alonso's testimony. Although under Illinois law, the testimony of a single credible eyewitness is sufficient to support a conviction (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513), Officer Bulava cast some doubt on Burden's testimony by noting that Burden made no mention, shortly after the crime, that he had seen the offender in the gangway or running through the alley prior to the shooting. Burden had shared meals with Alonso while the two were sequestered in State custody, during which time he discussed the case with police. It is impossible to determine how much weight the jury would have accorded Burden's account were Alonso's testimony to have been challenged as to bias or motive. The denial of defendant's right to cross-examine Alonso cannot be held harmless. In light of the third criterion, the evidence which may have been elicited by the prohibited cross-examination was not brought out in any other manner at trial, due to the blanket nature of the court's ruling in this regard. Such evidence, therefore, was neither cumulative nor duplicative un-

der the rule, and it was prejudicially excluded.

## III

█ Defendant's final contention is that the circuit court erred in refusing to permit him to impeach his own witness by means of this witness' omission of certain facts from his police report. On cross-examination, Officer Bulava testified that Burden had told him that he could identify the offender; on redirect, Bulava further stated that Burden had said that he knew the offender from the neighborhood. Defendant was subsequently precluded from asking Bulava whether his police report reflected these facts. Supreme Court Rule 238(a) provides that the credibility of a witness may be challenged by any party, including the one calling him. (87 Ill. 2d R. 238(a).) Although strictly speaking no prior inconsistent statement is involved in impeachment by omission, inconsistency in the literal sense is not always required; the omission of a fact, under circumstances rendering it unlikely that such fact should have been omitted, may be shown as impeachment. (*People v. Owens* (1976), 65 Ill. 2d 83, 91-92, 357 N.E.2d 465, *cert. denied* (1977), 430 U.S. 955, 51 L. Ed. 2d 805, 97 S. Ct. 1600, quoting *People v. Henry* (1970), 47 Ill. 2d 312, 320-21, 265 N.E.2d 876.) In *People v. Monroe* (1977), 66 Ill. 2d 317, 324, 362 N.E.2d 295, the supreme court noted that the failure of an undercover officer to refer in his report to a particular substance as "Mr. Natural LSD," where his report only mentioned "LSD," was a proper subject of impeachment. Similarly, defendant here should have been permitted to question Officer Bulava about the omission from his report of the alleged fact that Burden told him he could identify the offender since he knew him from the neighborhood, because the significance of this statement rendered it incumbent upon Bulava to include it in his report. Since literal inconsistency is not required by Rule 238(a) or for impeachment by omission, the circuit court's reasoning, that because the additional facts were consistent with Bulava's testimony on direct they were not impeaching, is incorrect.

The State maintains that the defense could not impeach its own witness under Supreme Court Rule 238(a) (87 Ill. 2d R. 238(a)) without first demonstrating that it was "surprised" by the testimony. Newly amended Rule 238, which became effective April 1, 1982, one month prior to the instant trial, omits any mention of surprise, a prerequisite prescribed by the earlier rule. The present rule is applicable to criminal proceedings (87 Ill. 2d R. 433), and is identical to Rule 607 of the Federal Rules of Evidence (Fed. R. Evid. 607). (Ill. Ann. Stat., ch. 110A, par. 238(a), Supp. to Historical and Practice Notes, at 199

(Smith-Hurd 1983).) Our supreme court has not as yet addressed itself to an interpretation of this rule nor has this specific point been considered by any other Illinois court of review. In the absence of Illinois precedents, it is appropriate to consider Federal construction in this regard. (*People v. Friedman* (1980), 79 Ill. 2d 341, 351, 403 N.E.2d 229. See· also *People ex rel. Lignoul v. City of Chicago* (1977), 67 Ill. 2d 480, 484, 368 N.E.2d 100.) Federal Rule 607 has been interpreted by Federal courts as allowing impeachment of a party's own witness even in the absence of surprise. *Scholz Homes, Inc. v. Wallace* (10th Cir. 1979), 590 F.2d 860, 863; *United States v. Long Soldier* (8th Cir. 1977), 562 F.2d 601, 605 n.3; *United States v. Palacios* (5th Cir. 1977), 556 F.2d 1359, 1363. See also *Robinson v. Watts Detective Agency, Inc.* (1st Cir. 1982), 685 F.2d 729, 740, *cert. denied* (1983), 459 U.S. 1105, 74 L. Ed. 2d 953, 103 S. Ct. 1191; 10 Moore's Federal Practice sec. 607.02 (1983-84 Supp.).

■ The reason for the rule prohibiting a party from impeaching a witness who appears in his or her behalf is traced by Wigmore back to primitive times when persons who attended trial on behalf of the parties were not witnesses in the modern sense of the term, but "oath-helpers." They were chosen literally to "swear off" the party on whose behalf they were called and were "ex-officio" partisans, which made it inconceivable that the party calling them could at the same time "gainsay" their testimony. Wigmore finds no substantial reason for preserving the rule. (3A Wigmore, Evidence secs. 896-899 (Chadbourn rev. 1970).) McCormick joins in criticism of the rule, maintaining that except for a few instances when witnesses are called to testify with respect to character or expertise, the party has little or no choice of witness but is limited to those who happen to have knowledge of the particular events in controversy. (McCormick, Evidence sec. 38 (2d ed. 1972).) In the Advisory Committee's Note to Rule 607 of the Federal Rules of Evidence, the observation is made that the traditional rule against impeaching one's own witness is based on false premises: practically, the party does not hold out his witnesses as worthy of belief since he rarely has free choice in selecting them and denial of the right to impeachment leaves the party at the mercy of the witness and the adversary. We are persuaded that in light of the more realistic language of present Supreme Court Rule 238(a) with its omission of the qualification of surprise, patterned after Federal Rule 607, the defense in the present case was not obliged to demonstrate surprise before seeking to impeach the witness that it called and denial of that right was prejudicial error.

For the foregoing reasons, the conviction and sentencing of

defendant must be reversed and vacated and the cause remanded for a new trial.

Reversed and remanded for a new trial.

STAMOS, J., concurs.

PRESIDING JUSTICE DOWNING, dissenting:

My review, analysis and evaluation of the record compel me to dissent. In my opinion, the evidence establishes beyond any reasonable doubt that defendant was guilty. Under such circumstances, I subscribe to the statement of Chief Justice Burger in *United States v. Hasting* (1983), 461 U.S. 499, 509, 76 L. Ed. 2d 96, 106, 103 S. Ct. 1974, 1980-81:

> "[T]he Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations, see, *e.g., Brown, supra*, 411 U.S., at 230-232, 93 S. Ct., at 1569-1570; *Harrington v. California*, 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969); *Milton v. Wainwright*, 407 U.S. 371, 92 S. Ct. 2173, 33 L. Ed. 2d 1 (1972). The goal, as Chief Justice Traynor [of the Supreme Court of California] has noted, is 'to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error.' [Citation.]"

## I

The majority concludes that there was prejudicial error when defendant was denied the right to cross-examine the State's witness, David Alonso, as to his bias or motive. Defendant, in his brief to this court, urges that the trial court "erroneously excluded all evidence of gang affiliation" and "the evidence would show that Alonso and defendant had been members of the same *gang*, defendant quit, and the *gang* threatened him with reprisal if he did not renew his activities or contribute to the gang coffers. In short, it was the defense theory that 'this case is being put on our defendant' by his old *gang*." (Emphasis added.)

At trial, before opening statements and any witnesses were heard, counsel discussed with the court whether evidence would be allowed of gang membership or gang affiliation, but no reference was made by defendant's counsel of any alleged threats. After such on-the-record discussion, an *in camera*, off-the-record discussion took

place between the court and counsel for defendant. Thereafter, the trial court ruled that during the trial there would be no reference to gang affiliation. The trial proceeded and amongst the State's witnesses were Robert Burden and David Alonso. Officer Gary Bulava was called on behalf of defendant. Upon the completion of Bulava's testimony, defense counsel renewed his request for evidence on "gang crime activity." Thereupon, counsel proceeded to memorialize for the record a summary of the earlier *in camera* proceedings,[1] stating:

> "We informed the Court that it was our theory of the defense that our client was a former gang member and that he was— and that he had quit the gang and that certain threats had been conveyed to him that if he didn't continue to quit, that he would not be around to be father to his children one way or the other, that his family, his mother and sister, his common-law wife, have been subjected to threats and harassment and some of the people directing those threats and harassment at him were collectors and enforcers for the gang, David Alonzo, and Mario Zuniga."

My analysis of the record indicates that defendant's trial counsel seemed to be basically talking about gang activities, and about "David Alonzo and Mario Zuniga"; he failed to make any offer of proof of what he *specifically* wanted to ask of, or prove by, Alonso. In fact, it is to be remembered that while Alonso was on the stand and subject to cross-examination, defense counsel did not actually try to go into this specific testimony. At most, three questions were asked of Alonso which might be interpreted as an attempt to delve into Alonso's bias or motive, or might also be interpreted as attempting to uncover gang activity. Upon the court sustaining objections, defense counsel did not make an offer of proof or explain the reason for pursuing that testimony. After the State rested and after Officer Bulava testified for defendant, defendant's attorney then brought up the *"in camera"* discussion on the record.

In my opinion, defendant failed to perfect the record as to the basis for his position. His theory throughout the trial basically concerned gang activity. As I read defendant's brief filed before this court, he did not articulate his position about bias and motive with the same interpretation and emphasis placed on it by my colleagues.

Generally, where an objection to evidence has been sustained, it is

---

[1]The vice of off-the-record proceedings is best illustrated by the problems which were unnecessarily created in this case. In my opinion, all proceedings in criminal trials should be on-the-record.

proper for counsel to make an offer of proof of what he expects to prove. As has been said, in the absence of such a showing, it is impossible to determine whether there was harmful error. (*Winslow v. Newlan* (1867), 45 Ill. 145, 150.) The offer must consist of facts and not conclusions. (*Martin v. Hertz* (1906), 224 Ill. 84, 89, 79 N.E. 558.) It is recognized that in some cases a formal offer is not necessary if counsel clearly indicates what he intends to prove. (*Scaggs v. Horton* (1980), 85 Ill. App. 3d 541, 546, 411 N.E.2d 870.) It is my position that the record here clearly fails to show specifically what defendant wanted to establish in the cross-examination of Alonso. Under such circumstances, I do not think there was prejudicial error.

## II

As to the question regarding defendant's impeachment of Bulava, I agree with the position taken by the majority as to the right to impeach a party's own witness. However, even if I accept, for the purposes of argument only, that it was error to refuse defendant the right to inquire about an omission from a police report, I do not find that fact could have affected the outcome of the case in any way. Officer Bulava was not an occurrence witness. Defendant was seeking to determine if the police report indicated Burden had told Bulava he had seen defendant around the neighborhood. The critical issue in the case was the question of identification and whether defendant shot the victim.

The jury saw the witnesses, heard the final arguments and found defendant guilty. Based on my review of the entire record, I am satisfied beyond a reasonable doubt that these alleged errors were not prejudicial. I fail to see the justification for a new trial in light of the overwhelming evidence of guilt.

For these reasons, I would affirm the conviction and judgment of the circuit court of Cook County.